```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE EASTERN DISTRICT OF TEXAS
 2                             TYLER DIVISION

 3   FENNER INVESTMENT, LTD.      )
                                  )      DOCKET NO. 6:07cv8
 4                                )
         -vs-                     )
 5                                )      Tyler, Texas
                                  )      9:30 a.m.
 6   MICROSOFT CORPORATION, ET AL )      February 19, 2009

 7
                       TRANSCRIPT OF PRETRIAL CONFERENCE
 8                  BEFORE THE HONORABLE LEONARD DAVIS,
                       UNITED STATES DISTRICT JUDGE
 9

10                        A P P E A R A N C E S

11
     FOR THE PLAINTIFF:        MR. BRETT GOVETT
12                             MR. KARL DIAL
                               MS. MIRIAM QUINN
13                             MS. KIRBY DRAKE
                               FULBRIGHT & JAWORSKI
14                             2200 Ross Ave., Ste. 2800
                               Dallas, Texas  75201
15
                               MR. OTIS CARROLL
16                             MS. DEBORAH RACE
                               IRELAND, CARROLL & KELLEY
17                             6101 S. Broadway; Ste. 500
                               Tyler, Texas  75703
18
                               MR. T. JOHN WARD, JR.
19                             WARD & SMITH
                               111 W. Tyler St.
20                             Longview, Texas  75601

21   COURT REPORTER:           MS. SHEA SLOAN
                               211 West Ferguson
22                             Tyler, Texas  75702
                               903/590-1176
23
     Proceedings taken by Machine Stenotype; transcript was
24   produced by a Computer.

25
```

2

```
 1   FOR THE DEFENDANTS:      MR. RUFFIN CORDELL
                              MS. LAUREN DEGNAN
 2                            FISH & RICHARDSON
                              1425 K. St. NW
 3                            Washington, DC  20005

 4                            MS. JENNIFER AINSWORTH
                              WILSON LAW FIRM
 5                            P.O. Box 7339
                              Tyler, Texas  75711-7339
 6
                              MR. JERRY RIEDINGER
 7                            MR. MICHAEL BROADDUS
                              PERKINS COIE
 8                            1201 Third Ave., 40th Floor
                              Seattle, Washington  98101-3099
 9
                              MR. MIKE JONES
10                            POTTER MINTON
                              P.O. Box 359
11                            Tyler, Texas  75710

12                            MR. TREY YARBROUGH
                              YARBROUGH WILCOX
13                            100 E. Ferguson St., Ste. 1015
                              Tyler, Texas  75702
14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please be seated.
 3              All right.  Ms. Ferguson, if you will call the case,
 4    please.
 5              THE CLERK:  Case No. 6:07cv8, Fenner v. Microsoft.
 6              THE COURT:  All right.  Announcements.
 7              MR. CARROLL:  Your Honor, good morning.  I'm Otis
 8    Carroll, and may I first introduce our plaintiffs, Pete and
 9    Susan Fenner.  And from Fulbright Dallas, Brett Govett, Karl
10    Dial, Miriam Quinn, and Kirby Drake.  And hiding in the jury
11    box is Johnny Ward.
12              THE COURT:  Where is Mr. Chiaviello?
13              MR. CARROLL:  Mr. Chiaviello is trying to settle the
14    case, Your Honor.
15              THE COURT:  This one?
16              MR. CARROLL:  This very second he is on the phone.
17              THE COURT:  All right.  Good.
18              MR. CARROLL:  I confirmed it.
19              THE COURT:  I don't know whether to believe that or
20    not.
21              MR. CARROLL:  It is the truth, Your Honor.
22              THE COURT:  All right.  Announcements for the
23    defendants.
24              MS. AINSWORTH:  Your Honor, for defendant Microsoft,
25    Jennifer Ainsworth, Ruffin Cordell, and Lauren Degnan.
```

1          MR. CORDELL:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. JONES:  Your Honor, on behalf of Nintendo I

4    would like to introduce Mr. Richard Flamm, Mr. Medway.

5    Appearing on behalf of Nintendo, Mike Jones and Trey

6    Yarbrough, Mr. Jerry Riedinger, Mr. Michael Broaddus, and

7    Tyler Peterson, Your Honor.  We are ready to proceed.

8          MR. RIEDINGER:  Thank you, Your Honor.

9          THE COURT:  All right.  Very good.  We are here for

10   the pretrial, and I would like to move as quickly as we can

11   this morning to work through this.  I think probably the best

12   place to start is with the motion for sanctions.  So if

13   plaintiff would like to be heard on that.

14         MR. DIAL:  Yes, Your Honor, Carl Dial for the

15   plaintiff on this.  The first point from the motion for

16   sanctions, Your Honor, deals with the failure by Nintendo to

17   comply with the Court's order.  If we can pull up the first

18   slide there.  We have just a timeline, Your Honor, to help put

19   it in perspective.

20         But this Court had a hearing -- or entered an order

21   on January 9th, 2008 where the Court ordered -- it is Docket

22   No. 112 -- that the Court ordered Nintendo to produce all of

23   the documents that were referenced in Exhibit L to the

24   plaintiff's motion to compel.  Exhibit L specified that the

25   documents we wanted were architecture documents and documents

1    that describe the circuitry of the accused systems.

2           It turns out that we later learned that in March of

3    2008 the Nintendo's expert Mr. Milner knew about and obtained

4    a copy of this One-Sheet Manual.  And Mr. Milner -- he got it

5    from NEC, which is one of their supplier's website.  You have

6    to go through a series of clicks to find it, but he got it

7    from their website.  He obtained it, told the lawyers from

8    Nintendo about it, and then we listed there March 17th, March

9    28th and then in July where they sent us letters saying we

10   produced everything, including a 30(b)(6) deposition of Mr.

11   Medway, who is here in the courtroom, where he testified that

12   all of the documents we received we provided them to Fenner

13   and Fenner Investment's Counsel.

14          Then our expert reports came out at the beginning of

15   September.  And after our expert reports were delivered, the

16   defendants for the first time -- Nintendo for the first time

17   produced this One-Sheet Manual, and then we took Mr. Medway's

18   deposition again as their 30(b)(6) witness.  On October 17th

19   Mr. Medway testified that, yes, this One-Sheet Manual is

20   covered by the Court's order.  Now he has since changed his

21   testimony, but that was his testimony under oath in his

22   deposition on October 17th.

23          If we could go to the next slide.

24          This is the One-Sheet Manual, and it is -- probably

25   the best version of it is Exhibit I to Nintendo's response,

1    and with a PDF you can enlarge sections of it.

2              If you will put the next slide up.

3              We enlarged two sections of it attached to our reply

4    to this motion, Your Honor.  This is one that deals with the

5    serial interface which is where the pulse generator is

6    located.  What this One-Sheet Manual is, it is a block diagram

7    for the architecture of the main chip that is used in

8    Nintendo's Nunchuk -- the Wii Nunchuk and Classic

9    controllers.  This shows the architecture where the pulse

10   generator is located.  This is in the upper left-hand corner

11   of the One-Sheet Manual.

12             If you go to the next slide.

13             This is the analog-to-digital converter which is

14   where the buffer circuit is.  This is kind of on the right

15   side of the One-Sheet Manual, Your Honor.  Again, this shows

16   the architecture of this particular chip.

17             Now, if we can go to -- one of the things that

18   Nintendo says --

19             If we can go to the next slide.

20             Nintendo says, well, it is not the same chip.  This

21   is the 511A chip.  What goes into our controllers is the 511

22   chip.  So based on that, Mr. Medway changed his testimony.

23   And at the top of this slide, what we have got at the top of

24   the slide is directly from the One-Sheet Manual.  And it is

25   part number 78KO/KC2.  The lower left-hand side is the

1   manual -- the 700-something page manual that Nintendo admits

2   applies to the 511 chip, the one that goes into their

3   controller.  It is the same part number.  And the one on the

4   right side is the 700-and-something page manual that deals

5   with this 511A chip. It is 78KO/Kx2 and it lists down below

6   what the "X" can stand for.  Sure enough one of them is the

7   KC2.

8          But then -- so it is the same part number.  But then

9   if you go to Page 19 of that manual for the 511A chip, it

10  describes what the differences are.  The differences are

11  immaterial the 511A chip and 511 chip with respect to what

12  they do in connection with the controller that is at issue

13  here.  It is a, you know, the -- the four bullet points are

14  listed there, none of which are involved in the claims for the

15  '751 patent.  Our expert's testimony is in the record, too.

16         If you go to the next slide, Kirby.

17         We have a couple of excerpts from Mr. McAlexander's

18  deposition where he describes this One-Sheet Manual is the

19  first place where the architecture of the chip is all put in

20  one place.

21         If you go to the next slide there.

22         Is a little more of the same.  Now, what Nintendo

23  says is, well, it is a different chip so, therefore, we were

24  not in violation of the Court's order on that.

25         But if you can go to the next slide.

1          This is a case, Your Honor, the Blackboard case

2    from the Eastern District where it says several cases in this

3    district hold that the relevant documents in a patent

4    infringement case include not only the documents about the

5    specific product but also related products.  I just think it

6    is clearly -- this One-Sheet Manual was covered by the Court's

7    order, clearly covered by the Blackboard -- the rationale in

8    the Blackboard case.  They didn't produce it.

9          THE COURT:  How did you finally get it?

10          MR. DIAL:  They did produce it to us in September of

11    2008 after we gave them our expert report.  After our expert

12    had gone about reverse-engineering this chip and doing all of

13    his work, providing a report, they produced it to us on

14    September 17th, I believe, of 2008.

15          THE COURT:  What harm did this cause you?

16          MR. DIAL:  Well, the harm that it caused us is that

17    our expert had to go through and reverse-engineer the chip,

18    reverse-engineer the chip itself, so it caused a lot of extra

19    work.  That is in his declaration, Your Honor, with respect to

20    that.

21          THE COURT:  That is what?

22          MR. DIAL:  That is in his declaration that is

23    attached to our motion.

24          THE COURT:  But it didn't cause him to take any

25    positions -- that it just delayed -- or it would have been

```
 1    more -- less expensive for him to come to the same

 2    conclusion --

 3              MR. DIAL:  That's correct.

 4              THE COURT:  -- he had to do through the

 5    reverse-engineering?

 6              MR. DIAL:  I think that is correct.

 7              THE COURT:  Response?

 8              MR. RIEDINGER:  Your Honor, Mr. Jones and Mr.

 9    Yarbrough will be arguing.

10              MR. JONES:  Your Honor, in response concerning the

11    One-Sheet Manual, the first thing you need to understand with

12    regard to the One-Sheet Manual, it is about a component that

13    is in no product in this case.  The 511 chip is different from

14    the 511A chip.  Everybody agrees to that.  They agree to it.

15              THE COURT:  How is it different?

16              MR. JONES:  It is different --

17              Could we go to Slide 1.

18              There are four differences that are pointed out in

19    the manual itself.  It is different --

20              THE COURT:  What about what he said that none of

21    those four differences apply to the patent-in-suit?

22              MR. JONES:  Well, one of the differences is, in

23    fact, consequential.

24              If we could go to Slide 1.

25              One of the differences is the analog digital speed.
```

1    The ADC in the 511 chips generates a digital output in

2    one-half the time of the ADC in the 511A.  Now, this is

3    significant to this case.  The value of the capacitor in the

4    ADC is dependent upon ADC speed.  The value of the capacitor

5    in this case must be a function of a predetermined threshold.

6            Now, this relates to the claims and is different in

7    a significant way.  But not only that, if we go to the manual

8    itself --

9            Could we go to the next slide, Slide 2.

10           If we could go to the manual itself, it clearly

11   says, look, this is only applicable to the 511A chip.  If you

12   are dealing with the 511 chip, then you need to deal with

13   these other manuals.  And those other manuals, the 511 chip

14   manual, which is a 730-page user manual, was produced in

15   November of 2007, well before your order, Your Honor.

16           THE COURT:  Mr. Jones, why did you finally produce

17   this if it is not related?

18           MR. JONES:  And that has been explained in detail

19   real well, too, Your Honor.  Your Honor, in this case -- you

20   need to understand where this all comes from.  This comes from

21   a website.  It is a publicly-available website that was

22   available to both of the parties for both of the parties to go

23   to and look at.  That is where this One-Sheet Manual comes

24   from.  Now, it is beyond disputed that both parties had access

25   to it.  Even before your hearing we had told --

1          THE COURT:  Did the plaintiff know how to go through

2     these steps to find it, or was that peculiar to your client?

3          MR. JONES:  Well, you know, we don't know, Your

4     Honor.  What we do know is that both experts tried to do it;

5     that both experts -- our expert -- you need to realize where

6     this One-Sheet Manual comes from.  It comes from in March of

7     2008 our expert went to the website long after we had

8     disclosed the same website to them.  He found it when he

9     perused this website.  Now, we also have deposition testimony

10    from their own expert that he had access to this website, and

11    he did the same thing we did.  You need to understand this

12    situation.  Both experts are doing independent research.  It

13    is not something in our files.  It is both experts doing

14    independent research and going to the website.  One of the

15    experts finds it; one of them does not.

16          Now, the first notice that we have that our experts

17    even found it that I can find in the record is in March of

18    2008 when he talks about finding it with an attorney that is

19    with the Perkins Coie Firm.  Now, at that point Perkins Coie

20    doesn't have a copy of it.  He just talks about it when he is

21    talking about his possible expert report and his opinions.

22    Later on as he is preparing his report in September, he says I

23    have a copy of this, it is something I reviewed.  Within days

24    of that conversation -- and again this is clear from the

25    record -- it is produced to the other side.

1            But what we have here, Your Honor, this is really a

2    remarkable situation.  We have here that they found one piece

3    of paper about a component that is not even in our products

4    that was on a publicly-available website.  It was a website

5    that we had referred them to and that they had said -- you

6    know, they admitted in correspondence that we had referred

7    them to that.  And they said, yes, we will look at those

8    websites.  We have one expert that finds it.  When he says I

9    have a copy of it in the file and he sends a copy to us, our

10   attorneys turn it over within days to them.

11           THE COURT:  Okay.  Thank you.  Response?

12           MR. DIAL:  Your Honor, with respect to that, the

13   architecture is identical with respect to the 511A and the 511

14   chip.  And we asked in the deposition of their 30(b)(6)

15   witness I asked him to find it, handed him a computer and

16   asked him to find it.  He wasn't able to.  Then they went on a

17   break and then he came back with five or ten different steps.

18   But the point is that the Court ordered them to provide

19   documents from their third-party suppliers.  Their expert told

20   them they had this document in March.  They didn't produce it

21   until September.  That is with respect to this.

22           We do have another point under the motion for

23   sanctions, Your Honor.

24           THE COURT:  Let's go on to the emails between Yamaha

25   and Nintendo.

1           MR. DIAL:  If we can go to the Slide 12, please.

2    Two slides over.

3           I will go ahead and start while she pulls it up,

4    Your Honor.  In October of 2008 right at the discovery

5    deadline and after the depositions of the Yamaha witnesses --

6    the Yamaha witnesses were deposed on September 11th.  In early

7    October, about a month after their depositions, these

8    documents were produced to us by Nintendo, in Japanese.  We

9    had to get them translated.  And we got them translated

10   shortly before we filed the motion for sanctions.

11          But in that -- in these withheld emails, this is the

12   first one from Mr. Suzuki of Nintendo to Mr. Ito of Yamaha,

13   one of the witnesses, where he asks him to alter some of the

14   documents that ultimately were used in the depositions.  He

15   asked him to add the YMF701, which is one of the products that

16   they wanted to get Yamaha to testify they sold in the United

17   States.  They asked him to separately create a similar

18   material for the YMF701, so he created some documents.  They

19   asked him could you change it to YMF715, a different product

20   number.  And then down at the bottom there is a reference to

21   the -- you haven't given us any documents on three-volt to

22   five-volt level conversion.

23          That was in January -- right before the Court

24   hearing in this case, in fact.  January 7th was the date of

25   that email.  Mr. Ito of Yamaha responds.

1            If we can get the next one.  Go ahead and pull it

2    up.  Yes.

3            He responds the next day saying, well, we have added

4    YMF701.  So he basically complied with these changes that were

5    being asked for to the documents by Nintendo's lawyer.  We

6    have added that.  We have added material explaining the

7    three-volt to five-volt thing.  Then down at the bottom he

8    says which users use our products at which voltages is hardly

9    known.

10            Fast-forward to the depositions.  Mr. Nakamura of

11    Yamaha testified, well the user set the joysticks at 3.3

12    volts and they also used these documents with the YMF701 and

13    the three-volt to five-volt differential in these

14    depositions.

15            If we can go to the next email there.

16            This one is -- was about a week before the

17    depositions --

18            THE COURT:  You didn't have any of these at the time

19    you deposed him?

20            MR. DIAL:  No, sir.  We got them a month later.

21            THE COURT:  Were you available to depose him

22    again --

23            MR. DIAL:  No.  Because it takes a long time to get

24    depositions set up in Japan, and these depositions were less

25    than -- about a month before the discovery deadline.  So we

1   got the documents at the discovery deadline.  By the time we

2   had them translated, it was a month after the discovery

3   deadline.

4           THE COURT:  All right.  Mr. Jones.

5           MR. JONES:  I think Mr. Yarbrough, if you don't

6   mind.

7           THE COURT:  All right.  Mr. Yarbrough, why weren't

8   the documents produced earlier?

9           MR. YARBROUGH:  The emails, well, Judge, I need to

10  show the Court the context of this, if I may.

11          THE COURT:  All right.

12          MR. YARBROUGH:  Amanda, would you go to --

13          I will be brief in this introductory portion.  I

14  believe it is important for the Court to understand.

15          Slide 3.

16          The implication, as I understand it, Judge, from

17  reading their briefing is that before -- that we deliberately

18  delayed providing some emails in order that we could alter a

19  document in a deceitful way before we produced those

20  documents.  This is after the lawsuit was filed in October of

21  2007.  This is when Nintendo requested of Yamaha information

22  about these chips.  So they make a request.  Again, this is

23  after the lawsuit was filed.

24          Go to Slide 4.

25          In response to that, Yamaha provides this circuit

1    diagram dated November of 2007.  So in response to the request

2    they produced this material on the configuration of the

3    chip -- or the chips.  Judge, I ask that you note the Bate

4    stamp number 54744 on that particular document.

5            Go to the next slide, Amanda, No. 5.

6            This is the translated version, Judge.  It is clear

7    from these documents, it is self-evident there is

8    communication between Nintendo and Yamaha.

9            Go next to --

10           Also, again, this is the translated version, same

11   Bate stamp number.  After this document was produced to

12   Nintendo --

13           Go to Slide 6, Amanda.

14           -- this is the email that they seem to claim as some

15   kind of smoking gun in which a simple request is made in which

16   Nintendo, the representative in Japan at NCL, Nintendo

17   Company, Ltd., said that you informed us when we talked last

18   year that the configuration of this material is identical to

19   that of the YFM701.  If this is correct, would it be possible

20   to provide us with material in which the phrase YMF701 is

21   added?  If YMF701 has a different configuration from that of

22   the present material, would it be possible to separately

23   create a similar material pertaining to same?

24           And then they also -- then the representative says

25   YMU715 is used in this material.  Can we assume it is a typo?

1    If it is, would you correct it?

2          Go to Slide 7, Amanda.

3          In response to that, Judge, Yamaha produces a

4    January 8th, 2008 document, a diagram in which the typo is

5    corrected and in which there is added that other chip that has

6    the same configuration.  That is a consecutive Bate stamp

7    number 54745.

8          Go to Slide No. 8, Amanda.

9          Here is the translated version.  Once again, Judge,

10    it is self-evident from the documents themselves.  There is

11    communication between the two companies.  These are

12    consecutively Bate stamped.  And then most importantly -- and

13    then also it showed -- the document itself specifically shows

14    the change in the typo from YMU to YMF, and it also has the

15    same phrase in there, same for YMF701.  It is spelled out the

16    changes they made in the second document.  Those are

17    consecutively Bate stamped.

18          And then go to Slide 9, Amanda.

19          In January of 2008, nine months -- eight to nine

20    months before these depositions were taken, these documents

21    both of them were produced, both of them side by side with

22    consecutive Bate stamp numbers.  It was obvious that they had

23    produced two documents in response to Nintendo's request

24    during the course of the litigation, and a simple comparison

25    would show that there were differences regarding the same

1    diagram of the circuit operation of those chips.

2            So there was not any kind of alteration of a

3    document that was hidden from Fenner in order to cover

4    something up.  Both documents were produced nine months before

5    these depositions; and, Judge, at the deposition itself the

6    witnesses, the Yamaha witnesses, Dr. Nakamura and Ito were

7    cross-examined extensively on that.

8            Go to Slide 10, Amanda.

9            This is just one example.  He is cross-examining

10   Ito.  I forget the lawyer's name.  But he is cross-examining

11   and asking specifically about these diagrams.  Slide 10 is the

12   cross-examination of Ito.

13           Slide 11, if you would go to that, Amanda.

14           Is the cross-examination of Nakamura.  Both were

15   examined extensively on that.

16           THE COURT:  Response?

17           MR. DIAL:  Your Honor, the response is we

18   cross-examined them on the documents they had produced.  We

19   did not have the emails that showed that Nintendo asked them

20   to make the changes to the documents.  We didn't have that,

21   nor did we have this email, Your Honor, which is Mr. Ito

22   testified there were U.S. sales.  And yet Mr. Ito had sent an

23   email earlier that said we don't have any information that we

24   can show you regarding whether any shipments were made to the

25   U.S. or not.  We didn't have that email either.  We didn't

1   have the email communications to be able to cross-examine them

2   about whether Nintendo was asking them to falsify documents --

3   whether -- we just didn't have it --

4           THE COURT:  What about the emails, Mr. Yarbrough?

5           MR. YARBROUGH:  Well, they came into the -- number

6   one, Yamaha is not a supplier.  It is not a customer.  It is

7   not a client.  This was a general prior art search.  The

8   emails came in sometime like in the summer of 2008 before the

9   team at Perkins Coie even had those emails.  It didn't even

10  hit the radar screen, Judge.  All of these substantive

11  documents, all of the data sheets, sales records, diagrams,

12  everything was produced.  These were just some communications

13  between NCL and Yamaha that really the majority of which are

14  courtesy exchanges regarding setting up the deposition.  And

15  they were eventually produced.  But they don't undermine the

16  credibility of the witnesses.  They don't contradict the

17  testimony of the witnesses.  In fact, what they do is

18  corroborate.  They substantiate --

19          THE COURT:  Well, I understand both sides will have

20  their arguments and spin on what they show, but the fact was

21  they were not produced.  Is that correct?

22          MR. YARBROUGH:  Well, they were produced in October

23  of 2008.

24          THE COURT:  Why were they produced in October?

25          MR. YARBROUGH:  Well, there were thousands and

1   thousands of documents produced.  These just weren't that

2   significant.  They weren't that important.  These were

3   communications --

4          THE COURT:  They weren't to defendant, but

5   apparently they were to plaintiff.

6          MR. YARBROUGH:  Well, they are trying to make it out

7   to be, Judge, but they had the documents side by side to see

8   the differences that were made.  They cross-examined them on

9   communications between NCL and Yamaha.  They had that

10  opportunity and did cross-examine them on the communications

11  that were taking place.

12         THE COURT:  Okay.  Final word.

13         MR. DIAL:  Final word, Your Honor, Nintendo Company,

14  Ltd., is a party.  They were parties to these emails.  And

15  under the Rules of the Eastern District, all relevant

16  documents are supposed to be produced, and we believe these

17  are certainly relevant documents.

18         THE COURT:  What harm have you suffered?

19         MR. DIAL:  We were not able to cross-examine the

20  Yamaha witnesses about these, Your Honor.

21         MR. YARBROUGH:  Can I respond to that, Your Honor,

22  because --

23         THE COURT:  Yes.

24         MR. YARBROUGH:  -- you asked Mr. Dial whether or not

25  they took the depositions again.  They didn't request those

1    depositions again.  At the conclusion of the deposition the

2    attorney specifically said we reserve our right to take these

3    depositions again.  They never made that request.  And over --

4    really I understand the disclosure requirements of the Eastern

5    District, Judge, but these are just -- these are not that

6    significant in terms of just a prior art search.  We have

7    produced all of the substantive documents.  If they really

8    wanted them, the parties throughout have made formal requests

9    and interrogatory requests for these kinds of things.  And

10   over a nine-month period they didn't ask for any kind of

11   communication of that nature.

12          THE COURT:  Okay.  Let's move on to the next one.

13          MR. DIAL:  The next motion, Your Honor?  The other

14   points with respect to this, Your Honor, that the time for Mr.

15   Ito's deposition in Japan, we had less time than they did

16   because the facility was closing down.  They delayed months

17   with respect to another stack of emails with third parties

18   that we have been asking for.

19          And then, lastly, the 30(b)(6) witness that they

20   produced, Mr. Medway, on the topic of their communications

21   with Mr. Potts, one of their experts/one of the inventors of

22   the patent, he had no knowledge of that, nor did he have any

23   knowledge about what any of these emails said.

24          THE COURT:  All right.  I am going to deny the

25   motion as to the unknowledgeable 30(b)(6) witnesses and as to

 1    the third-party suppliers and as to the Yamaha witness time.

 2    I'm going to grant it as to the One-Sheet Manual, and I am

 3    going to deny it as to the emails between Yamaha and Nintendo.

 4           Now, what relief does plaintiff seek for that one

 5    discovery sanction?

 6           MR. DIAL:  It is spelled out in our motion, Your

 7    Honor.  With respect to -- on Page 15 we requested that the

 8    Court immediately prior to the start of the trial and in the

 9    Court's jury charge the Court should instruct the jury that

10    Nintendo violated the Court's January 9, 2008 discovery order

11    by failing to timely produce relevant documents regarding the

12    infringement issues in the case.  And then with the other

13    piece we asked for in there was that the time be adjusted down

14    from Nintendo in terms of trial time.  We will leave that to

15    the Court, of course.

16           And we asked for them to pay $117,892 for the

17    expert's reverse-engineering, but that also includes our

18    Yamaha information and the deposition of Mr. Medway, so -- but

19    it is in Mr. McAlexander's declaration, which I believe is

20    Exhibit 2 to our motion in terms of how much of those costs

21    were directly attributed to his time.  I believe it was about

22    $30,000.

23           MR. YARBROUGH:  Your Honor, would the Court allow me

24    the courtesy of two points on this One-Sheet Manual?  Their

25    expert makes no reference to that 511A chip in his

1   supplemental report after all this documentation was produced.

2          Secondly, as I recall from the transcript in the

3   early part of 2008, there were statements from Counsel that

4   they had already engaged in reverse-engineering.  This was

5   back in January of 2008.  Reverse-engineering of the products

6   before this ever came to light to anybody.  So they had

7   already engaged in that effort.  That is in the transcript as

8   I recall it.

9          THE COURT:  Thank you, Mr. Yarbrough.  I have ruled

10  on that.

11         Do defendants have anything with response to what

12  sanctions should be imposed?

13         MR. JONES:  Your Honor, the only harm that could

14  have resulted from this is the reverse-engineering, Your

15  Honor, that they said they did before this.  Keep in mind,

16  too, Your Honor, With regard to your order, the evidence is

17  clear that it wasn't until March 2008 that our expert ever saw

18  this.  And it was produced after our expert said he saw it.

19  And I think the only harm, the only harm that they can show --

20  they have admitted to you in argument that it didn't change

21  anything except for reverse-engineering.  The only harm they

22  can show is reverse-engineering, which they said at the first

23  hearing in this case they had already done.

24         I think the only harm they have shown you, the only

25  harm that is in evidence in this case is they may have -- they

1    claim to have and their expert says they have some extra

2    expenses with regard to reverse-engineering.  Other than that,

3    there is no evidence before you, I believe, of any harm

4    whatsoever.

5              THE COURT:  Okay.  Any further response?

6              MR. DIAL:  No, Your Honor.

7              THE COURT:  All right.  Very well.  I am going to

8    take the sanction -- what sanction to impose under advisement,

9    and I will advise you of that later.

10             Let's move on to Fenner's motion, Docket No. 202 to

11   exclude the opinions of Keith Ugone.

12             MR. DIAL:  That one is mine as well, Your Honor.

13             Go to Slide 24.

14             Your Honor, Mr. Ugone is the damages expert for

15   Nintendo; and in connection with his expert report, he has two

16   problems -- multiple problems with it.  Number one, he opines

17   there should be a five million dollar damages cap based on

18   settlements that Fenner Investments entered into in a prior

19   case.  That is point number one.

20             Point number two, he relies on some testimony from

21   Mr. Potts and Mr. Livingston that we believe are barred by the

22   assignor estoppel doctrine.

23             If we can pull up the Ugone one.  Next slide.

24             I have a couple of cases here, Your Honor, which we

25   believe are dispositive with respect to Mr. Ugone's use of the

1   settlement agreements.  The first is the Fifth Circuit Tanner

2   case -- well, that just basically says they have the burden

3   when we object to it.

4            Let's go to the next one.

5            The Rude case is the United States Supreme Court.

6   The United States Supreme Court said that payment of any sum

7   in settlement of a claim for an alleged infringement cannot be

8   taken as the standard to measure the value of improvements

9   patented in determining the damages sustained by the owners of

10  the patent.

11           So the Supreme Court says you can't do it.

12  Nintendo's response says, well, that Rude case that only

13  addressed established royalties and does not address

14  reasonable royalties, which are what are sought in this case.

15  But the Supreme Court was not so limited.  It is pretty clear

16  you can't use settlement -- payments made in settlement to

17  establish damages period.

18           But we can go further than that because Judge Folsom

19  in the Eastern District addressed the same issue in the

20  Spreadsheet Automation case.  In the right-hand column, the

21  Court, therefore, finds that evidence of consent decrees,

22  settlements, and licenses made under the threat of litigation

23  would not be proper evidence of a plaintiff's damages to

24  present to the jury, so the motion to exclude the expert in

25  that case who relied on settlements was granted to that

1    extent.

2          Now, on the left-hand side for -- Nintendo cites to

3    some information on the left-hand side of the column there.

4    That deals with, well -- Judge Folsom said because the expert

5    considered evidence of settlement, we are not going to knock

6    out all of his opinions because he had other bases to support

7    his -- which were enough to support his opinion, and so the

8    Court didn't knock out his entire opinion in that case; but he

9    could not testify with respect to settlements.

10         Now, if we could go to Slide 32.

11         The other piece of this is Mr. Ugone not only relied

12   on the settlements but he also relied on the testimony of Mr.

13   Potts and Mr. Livingston who testified that the patent was --

14   I believe the testimony was -- let me get what they said; that

15   it is mostly a trivial design, it is not very complicated;

16   information that essentially says that the patent would be

17   invalid or worthless and the doctrine of assignor estoppel

18   bars that evidence that Mr. Ugone relies on.

19         And here is the Pandrol case that says any testimony

20   from someone who assigned a patent and was paid for that

21   assignment, it would essentially be that the patent would be

22   invalid or worthless, is barred.  Now, this testimony, Your

23   Honor, from this testimony that Mr. Ugone relies on, a jury

24   could conclude, number one, that the own inventor thought the

25   patent was invalid; or number two, that the own inventor, that

1    it was obvious and, therefore, the patent would be invalid

2    which is barred by assignor estoppel; or three that the patent

3    is worthless.  So they are trying to make an end run on the

4    doctrine of assignor estoppel by having an expert rely on it

5    and then get the evidence in that way.  So we think that that

6    basis is barred from Mr. Ugone.

7              If we could go to --

8              Well, the Diamond Scientific case says basically the

9    same thing.

10             If we could go to the last slide, which is 34.

11             The additional ground, Your Honor, is in the

12   hearing before this Court on June 13th, Mr. Chiaviello said,

13   well, the inventors they are going to be fact witnesses.  They

14   are not going to be experts.  And the Court responded I think

15   I agree with this.  It went on, the Court asked so how many

16   experts do you want?  Is four enough?  And between the two --

17   between Microsoft and Nintendo they argued for more, and the

18   Court eventually set it at six.

19             Now they have designated seven collectively, the

20   defendants, and Nintendo has three experts plus Mr. Potts

21   listed on their will call list -- I'm sorry I went over into

22   the Potts argument.  They are kind of related.

23             In any event, with respect to -- getting back to

24   Ugone, with respect to that for Ugone, number one, he relies

25   on settlements which are barred.  Number two, he relies on

1  assignor estoppel.  If you look at the rest of the evidence

2  that support it, he doesn't have a sufficient basis to prove

3  his reliability, which is their burden to meet when we have

4  objected to it.  So we believe his entire opinion should be

5  stricken.  And certainly the reliance on settlement agreements

6  and the assignor estoppel evidence should be stricken.

7          THE COURT:  Okay.  Response?

8          MR. JONES:  Your Honor, to put this in context, you

9  have before you in the brief in this case Mr. Ugone's report.

10  When you look at that report, it basically showed that he did

11  an analysis of a hypothetical negotiation between Lucent that

12  owned the patent at the time of the hypothetical negotiation,

13  and Nintendo.  He starts out quite correctly by looking at

14  Lucent's licensing practices.  He relies upon the deposition

15  testimony of Dr. Donald Dinella, Lucent's vice president of

16  business development and licensing, and says they have a

17  standard of trying to get one percent per patent.

18          He then does further analysis and says that there

19  are business or economic reasons why in these circumstances

20  you should go less, but he said I am going to be conservative

21  and I'm going to stay at a one-percent level.  He then places

22  a cap on the patent, on the royalties from the license

23  agreement of five million.  He relies -- his reasoning for

24  that is based upon a comparative valuation of the '706 and

25  '751 where you get into other license agreements that come

1    about as a result of settlement.

2              He also says that that is appropriate based on the

3    cost of alternative designs and also based upon the limited

4    value of this patent to the products based on other evidence

5    that he has before him.  Those are the bases of his opinion.

6              Now, in trying to move forward on this, I really

7    think this is more like a motion in limine than it is a

8    Daubert motion, Your Honor.  In trying to move forward on this

9    with regard to the motion in limine aspect of it, which you

10   will hear argument when we come to the motion in limines with

11   regard to Fenner's motion in limines, we have made the offer

12   to say, okay, he won't rely upon the settlement agreements.

13             Now, we have an argument under that.  In fact, I

14   think there is even a recent case -- we can't get a copy of it

15   yet, it is so recent -- from Judge Folsom where an damages

16   expert has been allowed to do that even though they may be

17   inadmissible.  They are certain it is case law.  And the cite

18   on that case --

19             Thank you, Mr. Cordell.

20             -- is Pioneer Corporation v. Samsung SDI, there is

21   an order saying that that can be done.  But we have made the

22   offer to say, okay, Bratic has referred to them some, Ugone

23   has referred to them some, let's just not do that.  We will

24   not refer to that evidence.  Now, we are not agreeing that he

25   can't testify because he clearly has other bases for his

1    opinion; but we have said with regard to this limited issue of

2    whether or not we get into settlements other than the

3    settlement by which this patent was acquired, that we won't do

4    it.  So we have made that offer to them.

5           Clearly, the case law is that there is a debate over

6    whether this is admissible or not.  But the case law is clear

7    that experts, even though they have relied upon such things

8    can clearly testify.  There is no case that says an expert

9    should be stricken from his opinion because he has used these.

10   In fact, both of the experts in this case did mention them in

11   their report.

12          In the Hanson v. Alpine Valley Ski case that they

13   cite, the Court affirmed the exclusion of the

14   settlement-related evidence, but they did not exclude the

15   expert's opinion.  The same thing happened in Spreadsheet

16   Automation Corporation v. Microsoft that they cite.  They

17   excluded the settlements that they said this:  Because the

18   plaintiff's expert does not rely upon -- excuse me I didn't

19   read that right -- does not rely exclusively upon settlement

20   agreements, he may properly consider such royalty rates in the

21   formulation of an opinion.

22          Here in his report itself Dr. Ugone has stated that

23   I have other bases besides these agreements for the opinions

24   that I express.  If I didn't rely upon them, then my opinion

25   would still be the same.

1         THE COURT:  What about the assignor estoppel

2    argument?

3         MR. CORDELL:  The assignor estoppel argument, again,

4    Your Honor, I think this is really more in the form of a

5    motion in limine.  What we have here is that the inventors

6    have stated that their invention was trivial.  Another one

7    said it was routine.  Another one said it was limited.  And

8    another one said it is not a significantly new development.

9    To quote Mr. Potts, he said it is mostly a trivial design, was

10   not very complicated.

11        Now, Georgia-Pacific factor number nine deals with

12   the utility of the patented device.  Georgia-Pacific factor

13   number ten deals with the nature of the patented device.  Now,

14   these statements do not say the patent is invalid.  We are not

15   presenting them for that purpose.  These statements do not say

16   the patent is unenforceable.  That is what the doctrine of

17   assignor estoppel deals with.  It deals with the inventors

18   can't come in here and say the patent is unenforceable.  The

19   inventors can't come in here and say the patent is not valid.

20        You know, the testimony which they solicited -- they

21   asked these questions on the deposition, and it was in

22   response to their own questions.  The inventor then says,

23   "Well, it is mostly a trivial design."  That is something that

24   talks about the utility about the invention, but it certainly

25   doesn't rise to the level of saying it is invalid.  We are

1   talking about two different things.  We are mixing apples and

2   oranges here.  He said it was not very complicated.  Again,

3   that goes to the utility of the invention.  That goes to the

4   nature of the patented invention.  It does not go to the fact

5   that we are trying to say it is invalid or unenforceable.

6   Keep in mind Dr. Ugone in his report has said I am assuming it

7   is valid.  I am assuming it is enforceable.  So he is very

8   correctly --

9          THE COURT:  Thank you, Mr. Jones.  I am going to

10   deny the motion as to the assignor estoppel, but I am going to

11   grant it as to any opinions which Dr. Ugone expresses which

12   rely on settlement negotiations for a royalty base or other

13   negotiations under the threat of litigation, including the

14   five million dollar cap.  To the extent he still has testimony

15   to give, I'm not going to strike his entire testimony; but he

16   cannot rely upon those settlement negotiations.

17          MR. JONES:  Just to make sure I understand, Your

18   Honor; but to the extent he has that same opinion with regard

19   to other bases, he can testify about it?

20          THE COURT:  Yes.

21          MR. JONES:  Thank you, Your Honor.

22          THE COURT:  Let's take up Mr. Potts.  Has that

23   pretty well been resolved?  Do both sides agree he is a fact

24   witness and not an expert?

25          MR. RIEDINGER:  Yes, Your Honor.  And we made an

1    offer to the plaintiffs on what they would say.  What we have

2    said is that Mr. Potts and Mr. Livingston, the two inventors

3    who are potential witnesses, will not give opinions on the

4    patent being ridiculous, obvious, or say they were stunned

5    when they found out that Lucent thought the patent was

6    something that could be used.  They are not going to say

7    anything about the patent being invalid or unenforceable.

8    What we want them to do, Your Honor, is simply describe the

9    work that they did and how long it took and people they worked

10   with, the kinds of things that inventors normally talk about,

11   the fact areas.  We are willing to eliminate those opinions

12   that they say are problematic; such as, saying the lawsuit was

13   ridiculous.  We won't have them approach that subject or say

14   it.

15          THE COURT:  Is that good enough for you?

16          MR. DIAL:  That's fine.  The only other point with

17   respect to that, Your Honor, is his testimony about the

18   trivial design.

19          MR. RIEDINGER:  Your Honor, we think that is

20   entirely appropriate for the inventors to describe the scope

21   of the work that they did.  When they said that it was not

22   very complicated, we believe that that is something relevant

23   especially to the damages subject.

24          MR. DIAL:  That goes straight to, is it worthless or

25   is it invalid?

1          THE COURT:  I will grant plaintiffs as to the

2    trivial design.  I think that gets too close to invalidity.

3          MR. RIEDINGER:  Can he say it is not very

4    complicated, Your Honor?

5          THE COURT:  Yes.

6          MR. RIEDINGER:  Thank you, Your Honor.

7          THE COURT:  Let's see.  So that takes care of Mr.

8    Potts, 203.

9          And I guess next would be Fenner's motion with

10   regard to Bristow and Lipovski.

11         MR. GOVETT:  May I just, taking heed of what you

12   said back there, that we are kind of short on time, this is

13   related to the summary judgment on prior art, so can I -- with

14   the Court's permission, I am happy to argue them separately,

15   but they do go together.  However you want.

16         THE COURT:  All right.  Go ahead.

17         MR. GOVETT:  Together?

18         THE COURT:  Uh-huh.

19         MR. GOVETT:  Thank you, Your Honor.  All right.  Dr.

20   Lipovski and Mr. Bristow, both of them in their expert

21   reports, Your Honor, they rely extensively on -- we need to

22   get it up there -- but they are hand-drawn diagrams.  Here it

23   is up on the screen here.  This diagram was drawn by a witness

24   at a company called ESS.  I believe the testimony is he didn't

25   have any personal knowledge of this, but he got from another

1    person at the company some sort of a schematic that the other

2    person had drawn, and then he drew this diagram on the basis

3    of that schematic.

4          All of the claim limitations are not present in this

5    schematic.  It was drawn outside of our presence.  It was not

6    drawn in the deposition.  But it forms the basis of the

7    opinions with respect to the ESS prior art in the Bristow and

8    Lipovski reports.

9          In fact, Mr. Bristow uses that very diagram there in

10   every single one of his claim charts with respect to ESS, and

11   those claim charts are in the record.  I will hold them up.

12   Here is the claim chart, Your Honor.  Here is Claim 1.  Here

13   is the limitation.  Here is the limitation on the bottom.  You

14   see the same diagram here.  And it is covered throughout.  He

15   just keeps putting it in here throughout his claim chart, and

16   then he basically in the rest of them says, well, see Slide 1,

17   see Claim 1 and so forth.  Dr. Lipovski does it a little bit

18   differently.  He makes it a center point of his expert report.

19          THE COURT:  Who drew this?

20          MR. GOVETT:  The witness at ESS during the

21   litigation.  During this litigation it was drawn.  It was

22   produced to us -- I'm glad you asked that.  Because when it

23   was produced to us, it was produced to us this is on the

24   bottom and on the top is redacted.  So there was something on

25   the top that was redacted.  When we deposed the witness -- Ms.

1    Quinn is sitting here to my left.  She went and deposed the

2    witness and said what is this?  They asserted attorney/client

3    communication to it.  So we were not even allowed to ask about

4    what was on this same document at the deposition.  They were

5    not represented by counsel sitting here in the courtroom.

6    They were represented by their own counsel.  Clearly they had

7    been in contact with them because the production of this

8    document came from -- it went from ESS purportedly to Nintendo

9    counsel, from Nintendo counsel and then to us.

10        So the reason this ties into our summary judgment

11   motion is we are saying, hey, look, number one this is not

12   reliable.  So Daubert is in play here.  You can't rely on it.

13   It is inappropriate for an expert to rely on something that is

14   hand-drawn.  Clearly we cite in the Daubert and in the summary

15   judgment motion the testimony from this witness that says

16   really I don't know much about it.  I just tried to go out and

17   find out what I could, and I put this together and I don't

18   know this, I don't know that.  So they are relying on it

19   extensively in their expert reports.  That is clearly

20   unreliable.

21        What you do is what we have done, of course, is you

22   get the products, you reverse-engineer them.  If they have

23   schematics you see if the products match up with the

24   schematics and so forth.  It is a gaping hole in their

25   evidence of prior art and their evidence of invalidity on this

1    topic, and it is a gaping hole on the expert reports.

2              Now, they try to bridge that hole by saying, oh, but

3    look at this document, look at this document, and look at this

4    document.  But the fact of the matter is -- and we point this

5    out in our summary judgment reply and in our reply on Daubert,

6    is, hey, you have no evidence of a lower power processor.

7    Remember the case is about an interface between a joystick

8    operating at a higher voltage and a processor operating at a

9    lower voltage.

10             Of course, the joystick is analog and the processor

11   is digital.  You have to have the two different voltages.

12   They don't have any evidence of that in this diagram or

13   elsewhere.  They try to patch it together, but there is no

14   corroboration of that.  There is no evidence of any RC

15   network; not in that diagram or elsewhere.  Of course, Mr.

16   Jones was talking about the capacitance value being a function

17   of predetermined threshold and so forth.  There is no

18   evidence --

19             THE COURT:  Why doesn't that just all go to the

20   weight?

21             MR. GOVETT:  The reason it doesn't go to the weight

22   is because you have got the Juicy Web case which goes all the

23   way back to that Barbed Wire case.  They want to rely on oral

24   testimony.  But the Supreme Court in the Barbed Wire case

25   said, no, oral testimony doesn't cut it.  Remember in that

1    case there were 24 witnesses.  The question was whether or not

2    some barbed wire had been shown at like a county fair or

3    something.  Twenty-four people took the witness stand and

4    said, yep, it was there.  One guy even got up and did a

5    demonstration of how he helped set up the exhibit.  And the

6    Supreme Court said not good, not good enough, doesn't cut it.

7    So that is the reason it doesn't go is because you have got to

8    have a proper corroboration; and the corroboration has to meet

9    the Daubert test and the Daubert standard.

10           The Yamaha is a similar issue.  Now, you have

11    addressed the issue on the emails, but Yamaha if you can look

12    at the next one, this is as bad if not worse.  This is a

13    hand-drawn diagram they sent the patent -- Nintendo sends the

14    patent to Yamaha.  Then, as you have seen in prior emails that

15    were put up here today, the Yamaha witness draws this diagram.

16    But, of course, he wasn't involved in the underlying work that

17    was done.  He says, oh, this is -- the diagram was based on an

18    earlier chip that we had, this diagram that I drew.  Of

19    course, there is no -- there are only handwritten notes that

20    talk about the earlier chip.  All we did -- he is trying to

21    make the link from earlier chip to chip which they claim is

22    prior art in this case.

23           There is not one shred of corroboration, other than

24    oral testimony, Your Honor, which under those cases, Juicy Web

25    and Barbed Wire is insufficient.  There is not one shred of

1   corroboration to make the leap from old chip to this chip.

2   And what they did is they hand-drew this one and then they put

3   what is called the level shifter.  If you look up on the

4   screen in the middle here.  This is the level shifter inside

5   this chip where it goes from high voltage to low voltage.  And

6   it is really just fantasy.

7          THE COURT:  When were both of these drawn?  Were

8   they drawn during a deposition?

9          MR. GOVETT:  No.

10          THE COURT:  Or --

11          MR. GOVETT:  That is the other problem is there is a

12   case -- I think it is Finnegan that is discussed in this line

13   of cases, Juicy Web, Finnegan and so forth line of cases that

14   even Finnegan said, well, it was drawn during the deposition

15   but that doesn't cut it.  These were drawn, both of these were

16   drawn outside of the deposition.  And you saw the emails back

17   and forth where Nintendo said, hey, you forgot something,

18   can't you put that in?  With input from Nintendo.  That is not

19   the type of evidence that an expert ought to be able to rely

20   upon.  It is not reliable.  It doesn't pass Daubert and all

21   the Kumho Tire and all that line of cases.  It is improper for

22   that sort of thing to come in.  It is clearly junk science.

23          We had no input with respect to these.  What is

24   their counter to that?  But you got to cross-examine them on

25   it.  So what.  We weren't allowed the opportunity to

1    cross-examine them fully because we weren't sitting there at

2    the time it go drawn, and you asserted attorney/client

3    privilege with respect to some of the documents -- some of

4    the -- the very sheet, the ESS sheet that contains that

5    drawing up at the top is redacted.  We were not allowed to

6    cross-examine with respect to what was redacted, and they are

7    not a party in the case.

8           So, clearly, and if you look at the next slide, that

9    is where I kind of wrap it up.  The documents that have been

10   produced in the case by ESS and Yamaha, they don't support

11   these hand-drawn diagrams.  The witness testimony does not

12   corroborate these diagrams.  There is bias there.  Obviously

13   they are working with Nintendo, both of them.  Not just Yamaha

14   but ESS as well.  That is in the record.  Of course, they were

15   prepared in secret.  And we don't know if Nintendo was sitting

16   there drawing them with them, drawing them for them.  There is

17   evidence that the Court has already seen today that they had

18   input on them.

19          So the reason I wanted to argue these together is

20   really they go together.  There is a Daubert issue with

21   respect to Mr. Bristow and Dr. Lipovski relying on any of this

22   evidence because it has huge gaping holes in it and it is

23   unreliable.  And then separate and apart from that if the

24   expert is stricken under Daubert, of course, the summary

25   judgment would be mooted; but separate and apart from that

1    under summary judgment it is missing key limitations.  This

2    evidence is missing key limitations.  There is no evidence of

3    a low power processor, there is no evidence of the RC network,

4    and there is no evidence of that capacitance value with

5    respect to the predetermined threshold following the wherein

6    clause in the claims.

7             Do you have any other questions, Your Honor?

8             THE COURT:  Response?

9             Thank you.

10            MR. RIEDINGER:  Your Honor, Mr. Broaddus will argue

11   for Nintendo.  Perhaps Mr. Ruffin Cordell might have things,

12   as well.

13            MR. BROADDUS:  Thank you, Your Honor.  Counsel for

14   Fenner is ignoring the actual prior art that defendants are

15   relying on.  They are focusing on these hand-drawn diagrams as

16   though that were the prior art, and that is simply not the

17   case.  The prior art here, Your Honor, are the audio chips

18   that ESS made and sold in the United States.  Those chips were

19   also used in computer systems that we have identified.  And

20   the expert reports not only discuss the hand-drawn diagrams

21   but also numerous documents that corroborate the accuracy of

22   those diagrams.

23            Mr. Govett showed you part of Mr. Bristow's claim

24   charts, and said in every case those claim charts use the

25   Yamaha hand-drawn diagram.  What he didn't tell you though was

1    that Mr. Bristow also cited the data sheets that ESS created,

2    the lower-level transistor schematic that corresponds to the

3    hand-drawn diagram, and other documents that corroborate the

4    accuracy of the hand-drawn diagrams.  In fact, Fenner, as far

5    as we can tell, doesn't take any issue with the accuracy of

6    the hand-drawn diagrams, just the fact that they exist.  There

7    is no evidence that there is anything inaccurate about those

8    diagrams or that they inaccurately describe the operation of

9    the chips.

10            THE COURT:  Let me ask you to respond to that.

11            MR. GOVETT:  Yes, we do take issue with the

12    hand-drawn diagrams.  As I said during my argument, they have

13    just drawn in this lever shifter on it.  This is on the

14    Yamaha.  And on this one they even admit -- Bristow even

15    admits in his report that this hand-drawn diagram doesn't show

16    the RC network that is required by the claims.  That is at --

17    I'll find it for you as soon as I find the RC network.  It is

18    at Page 2 of this claim chart.  For example, the RC network in

19    the diagram below is made up of potentiometer, a fixed

20    resistor; and he even admits it is not shown in the diagram

21    and capacitor in series connected to the resistor.  So they

22    admit the claim limitations are not there.  We do take issue

23    with these diagrams.

24            THE COURT:  Did their experts reverse-engineer these

25    chips?

1          MR. GOVETT:  They did not.

2          MR. BROADDUS:  What our expert did, Your Honor,

3   was -- Dr. Lipovski took all of the documents that corroborate

4   the accuracy of the hand-drawn diagrams and himself went back

5   through and showed how each part of the hand-drawn diagram was

6   fully supported by the lower-level diagrams.  For example, the

7   level shifter that Mr. Govett mentioned, was specifically

8   described in the Yamaha documents that describe the chips that

9   Yamaha actually made.

10          What the Yamaha engineer who designed the chips did,

11   was he used those low-level diagrams to create the high-level

12   hand-drawn diagram, but there is no -- at least from Dr.

13   Lipovski's review, there is no inaccuracy at all in the

14   hand-drawn diagrams themselves.  And for the ESS diagram and

15   the missing RC network that Mr. Govett referred to, that RC

16   network is described in the data sheets that ESS produced.

17   Those data sheets that the ESS witness testified about and

18   those show the RC network, and that is where the RC network

19   and the hand-drawn diagrams come from.  It is all in the

20   collection of documents that corroborate the hand-drawn

21   diagrams, which, in fact, are not the prior art.  They are

22   simply explanatory diagrams showing the operation of the

23   chips.

24          THE COURT:  I guess my concern, though -- I agree

25   with you they are not the prior art, but they are popping up

1    in his report, it appears, repeatedly.  And I presume they are

2    going to be presented to the jury, and I'm afraid this may be

3    confusing to the jury that this is the prior art when clearly

4    it is not.

5         MR. BROADDUS:  Well, Your Honor, our witnesses would

6    not say that the hand-drawn diagrams are the prior art.

7         THE COURT:  Why could your witnesses not, based on

8    the document and based on the testimony, come up with their

9    own diagram of what they believe the prior art represents?

10        MR. BROADDUS:  They could do that, Your Honor.  That

11   would be just fine.  I think their diagrams would be virtually

12   identical to the diagrams that ESS and Yamaha created.  They

13   could do that and testify about those diagrams.  That is

14   really the whole point, Your Honor.  These hand-drawn diagrams

15   are really just for ease of explanation.  It is very difficult

16   to explain transistor level diagrams in a reasonable amount of

17   time, which is why those hand-drawn diagrams were created in

18   the first place, just to make it easier to explain the chip's

19   operation.  If there is any issues about inaccuracy, that just

20   goes to the weight of the expert's testimony, not to its

21   admissibility.

22        THE COURT:  The other thing that concerns me is just

23   the communication that was going on between Nintendo -- I'm

24   not saying this happened, but the communication, the claim of

25   privilege that if defendant was involved in giving advice

1    through Counsel to how this diagram should look or something,

2    I would be very, very suspect of that; but if the expert --

3    your testifying expert comes up with his own diagram based

4    upon whatever evidence is admissible, then I think plaintiff

5    would have an opportunity to cross-examine that expert either

6    in deposition or at trial about the bases for the diagram he

7    has come up with.

8            MR. BROADDUS:  Your Honor --

9            THE COURT:  Let me ask plaintiff what they think of

10   that.  Would that solve your problem?

11           MR. GOVETT:  It does not and here is why, it is kind

12   of the chicken-and-the-egg problem.  He has already had it, he

13   has already seen it.  He has already been exposed to all of

14   this evidence.  It is not like where he is coming in just

15   completely unadulterated from it.

16           I am looking for -- there is some evidence from Dr.

17   Lipovski in the record where he has got an expert report --

18   and if I can find it I am looking here to bring it to the

19   Court's attention, but I will summarize it for you.  His

20   expert report says I have been informed, I have been informed,

21   I have been informed.  He didn't go out and do this work that

22   they are trying to tell the Court now that he has done.  Sure

23   he took the diagram -- after he had all this information, he

24   took a diagram -- or he could take a diagram and draw it to

25   match up with what he has already seen.

1          But that is like you got the answers to the test

2    already going in to take the test.  You are not coming in

3    fresh and cold.  You can't hit the purge button and it is all

4    gone.  I think if he is going to be allowed to testify on

5    this, he is wide open with respect to cross.  This is what

6    happened, and we didn't have this evidence, did you?  And you

7    didn't do this, did you?  And, in fact, they drew this for

8    you, didn't they?  So the cross is wide open.  So it is kind

9    of an all or nothing with respect to this evidence, our

10   position as we believe.

11         MR. BROADDUS:  Your Honor, on the point that Mr.

12   Govett just raised about Dr. Lipovski being informed of

13   things.  In his report what he says is that there were voltage

14   measurements made, of which he was informed.  Nothing to do

15   with the analysis of the low-level transistor level diagram.

16   That he all did himself.  He also reviewed the transcript of

17   the ESS witness.  That is how he was informed of the operation

18   of the circuit and the operation of that -- or how the

19   hand-drawn diagram was created.  He wasn't informed in any

20   other way.

21         MR. GOVETT:  I found what I was looking for, Your

22   Honor.

23         THE COURT:  All right.

24         MR. GOVETT:  If I might bring it to your attention.

25   It is right here.  It is at Page 11 of Exhibit 8 regarding the

1    plaintiff, Fenner Investments' motion.  This is Exhibit 8 to

2    the original motion I believe where he states -- and I am

3    happy to provide this to the Court if you wish.  He states, "I

4    have been informed that Compaq Presario" -- and then he gives

5    some numbers -- and the NEC Versa 2530 were taken apart and

6    inspected and are found to support an external joystick, which

7    was coupled to either the ESS ES1878 audio chip or the 1788

8    audio chip.  These ESS audio chips are closely related.

9            And he says the same thing with respect to Yamaha.

10   "I have been informed."  He has not gone out and done the work

11   that he ought to be required to do to come into this Court and

12   testify about these things.  You raised the question about did

13   he do reverse-engineering.  No, he did not.  He took these

14   diagrams and he looked at them and said, yes, they look good

15   to me.  He is relying on them.  That is not a reliable basis

16   with respect to offering testimony on these issues.

17           MR. BROADDUS:  Your Honor, the part of the report

18   that Mr. Govett is referring to is the voltage measurements.

19   What happened were voltage measurements were made under Dr.

20   Lipovski's direction about what was contained within the

21   Compaq Presario laptops along with the NEC Versa laptops.

22   There were low power processors in those laptops along with

23   the ESS audio chips.  It was the measurements and the fact

24   that those laptops contained the relevant chips is what he was

25   informed of, not the chip's operation.  The chip operation he

 1    learned about through analysis --

 2            THE COURT:  I think that will all go to the weight.

 3    I am inclined and I am going to deny the motion to exclude

 4    their opinions.  However, I will offer to the plaintiff the

 5    suggestion I made regarding having him come up with his own

 6    drawings and not having these drawings of the missing -- or

 7    the Yamaha people, in his report; and then you can

 8    cross-examine him on that or we will just leave it as is,

 9    whichever way.

10            MR. GOVETT:  We are fine to leave it as it is.

11            THE COURT:  Leave it as it is.  Plaintiff's motion

12    to exclude, Docket No. 205 and motion for summary judgment,

13    206 are denied.

14            All right.  Let's go to Fenner's -- Nintendo's

15    motion regarding Fenner's failure to mark

16            MR. RIEDINGER:  Again, Your Honor, that is Mr.

17    Broaddus.

18            MR. BROADDUS:  Thank you, Your Honor.  On the

19    marking motion there are undisputed facts here.  The first

20    undisputed fact is that Fenner filed the suit without

21    notifying Nintendo of the patent before filing.  Also it is

22    undisputed that Nintendo made products covered by the patent,

23    and we know that from two sources.  We know that from Mr.

24    Fenner's deposition in which he was a 30(b)(6) --

25            (Pause in proceedings.)

1          MR. BROADDUS:  Ah, sorry.  I misspoke, Your Honor.
2     Sony made the products at issue that we are talking about that
3     were covered by the patent.  And it was Sony who was -- Mr.
4     Fenner testified in his deposition, confirmed that Sony made
5     products covered by the Fenner patent.  We also know that Sony
6     made those products because Fenner originally sued Sony for
7     patent infringement of the patent at issue in this case.  We
8     also know it is undisputed that Sony was licensed under the
9     patent-in-suit here.  So under those circumstances, Your
10    Honor, Fenner had the obligation to prove that Sony marked the
11    products that were covered by the patent-in-suit in order to
12    be able to recover prefiling damages.
13         As far as that burden, Your Honor, it is
14    undisputed -- it is clear to us that the courts are consistent
15    that the burden of proving marking in this case is on Fenner.
16    The Supreme Court has held that, so has the Federal Circuit,
17    so has Your Honor in the Halliburton case.  Your Honor said
18    the patentee bears the burden of proving compliance with the
19    marking statute by a preponderance of the evidence.
20         So in this case in this context of the summary
21    judgment motion, Fenner had the burden of identifying evidence
22    that Sony complied with the marking statute and completely
23    failed to meet its burden.  In fact, Fenner produced no
24    evidence that Sony marked any of the products that were
25    covered by the patent that Mr. Fenner himself described

 1   existed.

 2            THE COURT:  Okay.

 3            MR. BROADDUS:  Also --

 4            THE COURT:  Are you done?

 5            MR. BROADDUS:  Yes, Your Honor.

 6            THE COURT:  Okay.  Response?

 7            MR. DIAL:  Yes, Your Honor.  The burden on Fenner to

 8   prove that marking occurred happens only after Nintendo meets

 9   its burden that the marking statute applies.  We have got

10   three cases that we cited to the Court, the MIT case here in

11   the Eastern District, as well as two other cases that

12   basically say that if there is no evidence that a particular

13   product was sold by Sony unmarked, then the marking statute

14   doesn't apply or hasn't been proven to apply.  And there is no

15   evidence in this case that Sony sold an unmarked statute.  It

16   is certainly not conclusive evidence.

17            The pleading they refer to is a superseded pleading,

18   so at best they have evidence that Sony was sued for patent

19   infringement of this specific patent, but there is no evidence

20   that Sony sold a particular product that was unmarked.

21            MR. BROADDUS:  Your Honor, there is evidence that

22   Sony sold unmarked products.  As I said, Mr. Fenner admitted

23   that Sony sold products covered by the patent.  Nintendo

24   looked for any evidence of marking by Sony, found none.  That

25   is in the record also.  There are several PlayStation products

1    that we found.  None of them were marked with the

2    patent-in-suit.  And we believe that the burden of proving

3    marking by Sony is squarely on Fenner.

4              THE COURT:  Before we get to the marking though,

5    what evidence do you have that the Sony PlayStation satisfies

6    all of the claims of the '751 patent?

7              MR. BROADDUS:  Mr. Fenner himself acknowledged that

8    the Sony products are covered by the Fenner patent.

9              THE COURT:  Has Sony ever admitted that?

10             MR. BROADDUS:  No, Your Honor.  Sony said it was

11   licensed under the patent, and Sony was dismissed from the

12   lawsuit.

13             THE COURT:  Was there ever an adjudication it was

14   covered by the patent?

15             MR. BROADDUS:  Not an adjudication but an allegation

16   by Fenner in the original complaint that Sony infringed the

17   patent.  We believe that is a judicial admission that is not

18   superseded by the amended complaint because the only reason

19   that Sony was dropped was because Sony was licensed.  Not

20   because the Sony products weren't covered by the patent which

21   meant --

22             THE COURT:  Don't people settle suits all the time

23   and take a license where they still contest it is covered by

24   the patent?

25             MR. BROADDUS:  That is true, Your Honor.  But what

1    doesn't happen all the time is the plaintiff taking the

2    position that Sony's products were covered.  He testified to

3    that effect under a 30(b)(6) deposition.

4            THE COURT:  All right.

5            MR. BROADDUS:  There is no restriction on some

6    missing claim limitation.

7            THE COURT:  Okay.  Thank you.  The motion for

8    summary judgment, failure to mark, Docket No. 204 is denied.

9            All right.  Let's go to Nintendo's motion for

10   summary judgment on infringement.

11           MR. RIEDINGER:  Thank you, Your Honor.  Let us get

12   our slides up here.

13           THE COURT:  It is essentially the same as

14   Microsoft's, right?

15           MR. CORDELL:  It is, Your Honor.  We have tried to

16   coordinate so we don't overlap too much, but we do have much

17   of the same material.

18           MR. RIEDINGER:  There are, however, differences,

19   Your Honor.  And I would like to focus on, initially, one of

20   the products of Nintendo that is different from everything

21   else in the case.  I would really like to talk about two

22   things; one is pulse width and the other is lower voltage.

23   Mr. Cordell would have some discussion regarding the Microsoft

24   products that are really different.

25           But focusing on pulse width, the key language is

1  language that appears in all of the asserted claims, a width

2  of said pulse representing a coordinate position.  That is

3  from Figure 3.  They are talking about this PCN, the input to

4  the PC that is a pulse, as we show here, that is either wider

5  or narrower depending on the joystick position.  This is, of

6  course, something that we don't do.  It is something that

7  Microsoft doesn't do; and Mr. Cordell can explain that in

8  detail, because we have radically different pulses.

9          What I want to focus on is the GameCube.  Now, Your

10  Honor, we have four different products that are accused of

11  infringement, four different controllers.  These two are the

12  GameCube controllers that go with the GameCube counsel --

13  console, which is the first thing that I would like to talk

14  about.  In addition, we have these two controllers that

15  connect up to the Wii.  And they have very different signals,

16  Your Honor, that are accused of infringement that are

17  contended by the plaintiffs to be within the patent.

18          So what we see here, Your Honor, is an eight-bit

19  signal, that is, eight pulses that are encoded.  It is like

20  Morse Code.  So we have a wide pulse over here on the left --

21  if I can get my pointer --

22          THE COURT:  So eight bits would be a byte, right?

23          MR. RIEDINGER:  Yes, Your Honor, eight bits would be

24  a byte.

25          THE COURT:  So is it based on a byte or a bit?

1          MR. RIEDINGER:  The joystick data is contained in a

2     byte, Your Honor, an eight-bit byte; and you need all eight of

3     those bits.  What is significant, Your Honor, is that one of

4     the theories that Fenner has is that in order to find a pulse

5     with a width that supposedly represents joystick position,

6     they have to look at all eight of those pulses.  In other

7     words, they are disregarding Your Honor's claim construction

8     which says that a pulse is a single cycle of variation.  They

9     are looking at eight cycles of variation and saying that

10    provides the pulse, because, of course, without having all

11    eight of those bits you don't have any useful information

12    regarding what the joystick position is.

13          The GameCube Wavebird controller is very similar.

14    The shape of the pulses is a little bit more square as opposed

15    to the pointed tops.  So what they have done is first said we

16    have to look at all eight bits.  If that doesn't work, they

17    have an alternative theory; and they have looked at this

18    language and this comes from, I believe, Claim 9.  And they

19    have changed that language to say that their interpretation is

20    that one or more widths of one or more of the pulses

21    represents one or more coordinate positions.  And that is

22    because if you will look at just one bit, one pulse in the

23    GameCube, you simply don't have enough information to tell you

24    anything remotely like the joystick position.

25          So, again, they start out with the eight-pulse

1    version;  but if you look at just one pulse, a one pulse just

2    tells you whether you have a 1 or 0.  So a wide bit is a 1 and

3    a narrow bit is a 0.  But if all you have is just one of those

4    pulses, you don't know the joystick position.  There are 256

5    possible joystick positions, and 255 of those are positions

6    that have a 1 somewhere inside the signal that is coming out

7    the eight bits of the signal.  By the way, Your Honor, that is

8    a signal that gets encoded and decoded and transformed as it

9    is sent from the joystick to the processor console -- the

10   console processor because it gets changed into different kinds

11   of positions.

12           But the key thing is if you have just one bit, you

13   don't know the joystick position.  You simply don't.  It is

14   kind of like you have got one bit out of eight.  That doesn't

15   tell you anything.  It is much like having one letter in an

16   eight-letter word.  You don't know what that word is.  It

17   could be joystick, it could be presents, it could be bar

18   stool, it could be any of a number of --

19           THE COURT:  I understand what you are saying

20   regarding the claimed invention.  What is your interpretation

21   of how the patent interprets one bit?

22           MR. RIEDINGER:  The patent doesn't operate by using

23   a pulse signal that is a serial binary signal.  Instead, the

24   patent simply has a pulse that is longer or narrower.  And

25   then inside the processor they measure the time it takes for

1   the start of that pulse and the end of the pulse, and the

2   amount of time in microseconds tells you whether the joystick

3   is way off in one end because it is a very short pulse or way

4   off in the other end because it takes more microseconds for

5   that pulse to occur.

6            THE COURT:  That pulse is contained within one bit

7   as opposed to a byte?

8            MR. RIEDINGER:  That pulse is contained within one

9   cycle.

10           THE COURT:  It is not a sum of the pulses within the

11   byte?

12           MR. RIEDINGER:  It is not, Your Honor.  There is

13   absolutely no suggestion anywhere in the patent that there is

14   an accumulation of multiple pulses in order to have the data.

15   It is simply one pulse that is wider or narrower -- wider or

16   narrower and the clock inside the console processor is like a

17   stopwatch.  It clicks on when the pulse starts and clicks off

18   when it is over; and then the amount of time it took for that

19   pulse to occur, is then translated by the processor into a

20   joystick position.  It is radically different from the way the

21   GameCube is encoding using -- like Morse Code, dits and

22   dashes, long and short pulses.

23           But, again, there is just no way that you can look

24   at one pulse and get information on the joystick position that

25   provides you anything of potential use.  And the claim

1  language is a pulse, not a collection of eight pulses.

2          THE COURT:  Let me get plaintiff's response to that

3  point.

4          MR. RIEDINGER:  Okay.  Sure, Your Honor.

5          MS. QUINN:  Good morning, Your Honor, Miriam Quinn

6  for the plaintiff.  First of all, I think we are confusing

7  bits and digital bytes and bits with pulses.  There are two

8  different things going on in the claims.  In the interface

9  there is a first stage where you have a digital output and

10  then the second stage which is the pulse.  The pulse generator

11  generates a digital output that has pulses.

12          What we are hearing now is that defendants are

13  twisting what we have said about how their digits come out of

14  their analog-to-digital converter and say that that is the

15  pulse.  That is not what Fenner contends is the pulse.  The

16  pulse is what that byte gets transformed into a signal that

17  has pulses.  In the case of GameCube, they use pulse width

18  modulation to change how those bits look -- that byte.  In the

19  GameCube they completely change that and you do have a pulse.

20          If I can show Slide 18, that is one of the fact

21  issues we have is how do we interpret what the products are

22  outputting at the pulse generator state?  And it is a serial

23  generator.  And saying that the patent did not contemplate

24  serial communications is wrong.  Serial communication has been

25  around for communicating joystick positions since the time of

1    the patent.  To say that it wasn't there, would be to exclude

2    all that prior art.  There is no support for that in the

3    record.

4              You see the fact issue here is do you have all those

5    eight bits, are they encoded in a way that meets the claim

6    limitation as a pulse?  And our position is that it does.  The

7    Wii especially where you are shown there -- Your Honor, if I

8    can have the second slide after this one 19, what you have

9    here is you do have positions where there is -- if we go to

10   the way they are reading the claims where you have to have one

11   single pulse within a time period, that there is a pulse that

12   gives the coordinate position.  If you can click again you

13   will see there is a pulse.  We do not --

14             THE COURT:  Are you saying that their machine

15   translates those bit pulses into this larger pulse shown in

16   the red?

17             MS. QUINN:  Correct.  We do not refer to the bits as

18   pulses.  They are digital output.  We call the signal in red,

19   that is the pulse.  That does get converted.

20             THE COURT:  Where does that signal come from?

21             MS. QUINN:  The one in red, Your Honor?

22             THE COURT:  Uh-huh.

23             MS. QUINN:  That comes out from their serial

24   generator, their pulse generator.

25             THE COURT:  Response?

1          MR. RIEDINGER:  Your Honor, they are showing a

2    picture of the Wii pulses.  They are completely different from

3    the GameCube pulses.  I have positions that I would like to

4    take on the Wii, but I started with the GameCube.  And if you

5    look back at No. 18.

6          Could you put their Slide No. 18 back up, please.

7          You can see -- this isn't 18.  That is 19.  Put 18

8    up again, the one that she was talking about, the previous

9    slide.  There it is.

10          It says, Figure 4, Wii, if you look at it.  It is

11    not the GameCube.  If Your Honor happens to have the exhibits

12    to our motion, Exhibit 5 Page A-8, for example, shows the

13    GameCube pulses, and the GameCube pulses look like this.  And

14    this is what Mr. McAlexander's description of the game pulses

15    looks like, completely different from what Ms. Quinn was

16    describing about the Wii pulses.  So I don't think she has

17    answered at all how the eight separate pulses can become a

18    single pulse because they don't, and their expert Mr.

19    McAlexander doesn't suggest that they do.  But I would like to

20    talk about the Wii, if I can, Your Honor.

21          THE COURT:  All right.  Go ahead.

22          MR. RIEDINGER:  So these are three of the images

23    that they put in their brief.  I believe it comes from their

24    opposition to our motion on Pages 10 and 11 where they have

25    what they suggest are the Wii pulses.  They are idealized

1   versions of the signals in the Wii.  These are what the Wii

2   signals actually look like.  Again, these are signals that are

3   described in Mr. McAlexander's report for the Wii.  You can

4   see that they are not just single pulses.  They are not

5   idealized as Ms. Quinn suggests they are.

6          Let's assume for argument's sake that the kinds of

7   pulses they put in their brief are what are described in the

8   Wii, those pulses do not rely on the width in order to

9   determine the joystick position.  The system works completely

10  differently.  Let's focus in on this one.  What is missing

11  from this is the very important part, second part, which is

12  the clock.  In order for these pulses to be evaluated, a clock

13  has to be used to determine whether at the time the clock has

14  a cycle, the value of the Wii joystick is high or low, the

15  value of the signal is high or low.

16         So, for example, I have shown here the first clock

17  cycle.  What the computer does is it looks to see whether at

18  the time of that cycle the blue signal is high or low, it is a

19  high voltage or a low voltage.  If it is a high voltage, it

20  interprets that as a digital 1.  So you can see that at the

21  first four clock cycles the computer determines that you have

22  a digital 1.  Then at the next clock cycle because the voltage

23  is low, the computer determines it is a digital 0.  So the

24  position of the pulse is important, not the width of the

25  pulse.  You can see that by looking at pulses that would have

1    different widths.

2            So if we have this red pulse that is a different

3    width than the blue pulse, it has exactly the same joystick

4    value even though it is a different width.  If we have a wider

5    pulse that has a different width, it still has exactly the

6    same value.  But then if I take this same wider pulse and I

7    just shift it a little bit -- it has the same width I just

8    showed.  I am going back and forth.  It is the same pulse,

9    just shifted.  Now there are five positions, five clock

10   positions where the voltage level is high, so the same width

11   in this circumstance would produce an entirely different

12   joystick position, five 1's followed by three 0's.

13           So we don't use the width at all.  The width does

14   not represent joystick positions.  Different widths can

15   represent the same positions.  The same width can represent

16   different positions.  What we rely on is when the clock

17   occurs, whether the voltage level of the signal is high or

18   low.  So that is completely different from anything that is

19   described in the patent.  It is completely different from the

20   claims which require a width representing joystick position

21   not a location of a pulse relative to a clock cycle.

22           Then, Your Honor, I would like to go on to lower

23   voltage unless you wanted Ms. Quinn to respond.

24           MS. QUINN:  Your Honor, if we can I would like to

25   show you our Slide 21.  I think we have heard Nintendo

1    admitting that the clock signal is important, time is

2    important.  And as Your Honor will remember the definition

3    that the Court construed a width being was the pulse -- the

4    width of the pulse assessed in time or distance, so what we

5    have here is you have time intervals that are important in

6    determining the width of the pulse.

7           So at the time -- the time at which the pulse begins

8    and the time at which the pulse ends is just as important as

9    how long that width is.  And that determines absolutely the

10   unique position as seen on the slide, and this is something

11   they don't dispute.

12          THE COURT:  Okay.

13          MR. RIEDINGER:  So now, Your Honor, the next thing I

14   would like to talk about is the lower voltage.  So this is

15   really the key to the invention.  This is what the patent, the

16   '751 patent is all about because the point of the patent is to

17   have a connection between a high-voltage joystick and a

18   low-voltage processor.  It does so explicitly by having an

19   interface circuit with the second source voltage that is lower

20   than the first source voltage.

21          So what Lucent was working on when they developed

22   this patent was using conventional five-volt joysticks to

23   connect them to host computers, personal computers; and they

24   did so with an interface card.  That is what they were

25   developing an interface card.  So they had the interface card

1    operate at three volts, and the whole purpose was to have

2    circuitry that dropped the voltage from the conventional

3    joystick in the interface so that you could connect up with a

4    lower voltage processor.  That, of course, is something we

5    don't do.

6              Now, at the Markman proceeding before Your Honor

7    about a year ago, Fenner presented this side, which we at the

8    time thought was correct and which we continue to believe

9    describes how the invention operates as described in the

10   patent.  This is their slide.  They called it a walk-through

11   of Claim 9.  They have also said that Claim 9 -- in response

12   to our summary judgment they have said that Claim 9 is

13   representative.  So in the walk-through of Claim 9 they have

14   showed there are five basic parts.  There is a joystick at the

15   part which connects to an RC network which connects to a

16   buffer circuit, which connects to a pulse generator, and

17   connects to a processor.

18             And then they have the red box.  The red box is the

19   interface.  And then the purple box, the purple box is what is

20   called the interface circuit.  We agreed with what is shown in

21   this drawing.  I have zoomed in on the bottom.  There are a

22   couple of things that is significant in what they have said.

23   In the upper right it is kind of hard to read, so I'm telling

24   you what it says.  It says lower voltage.  That is, the purple

25   part is the lower voltage.  The buffer circuit and the pulse

1   generator are inside the purple part, so they should be at a

2   lower voltage.

3          Let me just stop right there.  There is something

4   else I am going to get to, which is the processor.  The

5   processor is outside the interface, outside the interface

6   circuit.  Let me first talk about the lower voltage because we

7   don't have the lower voltage in either what they call our

8   buffer circuit or pulse generator.  I believe the same thing

9   is true for Microsoft, by the way.  So this is a drawing

10   prepared by Fenner's expert, Mr. McAlexander.  He prepared one

11   of these drawings that are virtually identical for each of the

12   accused products, for all four of the accused Nintendo

13   products and for all of the accused Microsoft products.

14          He said here are the same basic five parts; the

15   joystick, RC network, a buffer circuit, a pulse generator, and

16   a processor.  But he admitted -- oh, excuse me.  Then he said

17   the red part, that is the interface, and here is the purple

18   part which he said is the interface circuit, the thing that is

19   supposed to be operating at a lower voltage.

20          Now, he admits that the joystick, the RC network,

21   buffer circuit, and the pulse generator are all operating at

22   the same voltage.  There is a reason for that.  If you look at

23   the internal parts of each of our accused products, this is

24   the Wii Nunchuk.  You see the joystick that I am pointing to

25   here.  That interfaces with an interface chip.  That is Mr.

1    McAlexander's term, an interface chip.  That interface chip is

2    operating at three volts.

3           Now, the reason it does that is this is the Nunchuk,

4    Your Honor, and the Nunchuk is connected to another product

5    called the Wii remote, and the two of them are wireless.  The

6    Wii remote has the power supply, which is two batteries, the

7    power supply for the Wii remote and Nunchuk.  The same thing

8    is true, by the way, with the Wii Classic which gets its power

9    from that three volt source.  So that chip is operating at

10   three volts.  And according to Fenner, the RC network, the

11   joystick and the buffer circuit and the pulse generator are

12   all operating at that same three volts, getting that three

13   volts from the batteries inside the Wii remote.

14          Then the same thing is true if you look at the Wii

15   Classic.  The chip is there.  They say the chip has the RC

16   network.  They say the chip has the buffer circuit and the

17   pulse generator.  They say that for all of our products.  They

18   say the same thing for the GameCube wired and the GameCube

19   wireless controller called the Wavebird.  All of them they

20   admit have four of those five elements operating at the same

21   voltage level.  That is even though the drawing, the

22   illustration that they provided to Your Honor at the Markman

23   hearing showed a lower voltage for both the buffer circuit and

24   the pulse generator.

25          There is a very good reason why the buffer circuit

1    and the pulse generator are shown in their diagram as

2    operating at a lower voltage.  That is because in the

3    prosecution history of the patent, that is what was

4    represented to the Patent Office; that at least the pulse

5    generator that is downstream from the buffer circuit, has to

6    operate at a lower source voltage.  So this is out of the

7    December 19th, I believe, 2000 amendment that was submitted to

8    the Patent Office.  They submitted an amendment and explained

9    the consequences of the amendment.  And they said -- here is

10   the important part, the device of Claim 1 provides an

11   interface -- and here is the important part -- using circuitry

12   having source voltage that is lower than the first source

13   voltage to generate pulse widths representing joystick

14   coordinate position.

15          So whatever it is that generates the pulse has to be

16   in circuitry using a source voltage that is lower than the

17   first source voltage, and the first source voltage is the

18   joystick.  So it is an interface using circuitry with a lower

19   source voltage to generate pulses.  That means at least the

20   pulse generator has to be at a lower voltage.

21          Now, if you go back to what Mr. McAlexander said, he

22   doesn't show the pulse generator operating at a lower voltage.

23   It just absolutely has to, but yet it doesn't.  So they have a

24   theory.  And their theory is one that we believe is directly

25   contrary to Your Honor's claim constructions and, of course,

1    is directly contrary to anything that is described in the

2    patent.

3            So if we look at what we put in front of Mr.

4    McAlexander at his deposition, this is the same drawing.  We

5    had him label things, label what the voltages were.  This is

6    his handwriting in the handwriting stuff -- handwritten

7    stuff.  So the buffer circuit and the pulse generator are

8    shown at three volts, the same voltage as the joystick.  If we

9    zoom in on the right over here what we have is the pulse

10   generator operating at three volts.  It is the same as the

11   joystick.  And where do they find the lower voltage?  Well, it

12   is over here inside the processor.  So the whole point of this

13   invention, the whole point of the development that is

14   described in the patent, is to have a connection, an interface

15   between a joystick and a processor.

16           But instead of saying that the circuitry that

17   connects has that lower voltage that is used in the interface

18   to drop, they say that we infringe because there is a drop

19   inside the processor.  The processor itself, the thing

20   connected to by the interface, is what provides that voltage

21   drop.  That just is contrary to the idea that an interface is

22   between the joystick.

23           Let me show another way of putting it.  Here is the

24   Wii Nunchuk.  It connects to the Wii remote.  Then it sends a

25   radio signal to the Wii console which has a mother board.

1   What they say is the buffer circuit and the pulse generator

2   are inside the Nunchuk, and the processor is over here in the

3   Wii console.  In order to find the lower voltage, they have to

4   include the interface going all the way into the interior of

5   the processor.  That is directly contrary to the claim

6   language.  The claim language says an interface between a

7   joystick having a first source voltage and a processor, not an

8   interface that includes a processor at a lower voltage but the

9   interface is between.

10          Your Honor gave a claim construction of the

11  interface circuit.  It is a circuit that connects the joystick

12  and the processor.  The interface circuit is what has to be at

13  a lower voltage, yet it is the processor, not the stuff that

14  connects to the processor that they are saying is a lower

15  voltage.  The examiner's reason for allowance also includes an

16  emphasis that the interface is between.  The examiner said it

17  twice in explaining the reason for allowance.  The claim

18  recites an interface between a joystick device and a

19  processor.  And they also say this provides an interface

20  between the joystick and the processor.  Again, by going to

21  the interior of the processor, they are not identifying an

22  interface that is one that matches anything having to do with

23  what the invention is.

24          THE COURT:  Okay.  Thank you.  Response?

25          MS. QUINN:  Yes, Your Honor.  Thank you.  Fenner has

1    followed all of the claim constructions.  This is the

2    interface between a joystick device and a processor.  We think

3    where the confusion is that Nintendo's products use an IBM

4    powered PC.  These are enormous chips with lots of

5    functionality.  The actual processor that processes data is

6    not the whole chip.  It is a processor core that is within the

7    chip.  There is a lot of stuff in that chip.  As you saw, Your

8    Honor, from the picture of the One-Sheet Manual, these

9    microchips are very complex, and they have a lot of stuff in

10   them.

11          The specification does not state that every

12   component of the interface circuit has to operate or has to

13   have a lower source voltage.  There is no description of this.

14   They have not put out any cite to the specification that says,

15   yes, the pulse generator has the lower source voltage.  They

16   can't because that is not the point.  The point is to

17   interface the lower processor with the higher voltage

18   joystick.  It doesn't say everything inside that circuit has

19   to be at a lower source voltage.

20          In fact, the specification says you may use CMOS

21   logic to perform the interface circuit, and that may -- CMOS

22   is at a lower voltage.  That "may" means that's a design

23   choice that an engineer can do.  And the point that I made

24   earlier, too, is that these -- the two stages within the

25   patent, first you convert it to a digital signal and then to a

1    pulse.  This takes away the issue of what voltage levels we

2    have.  They can be manipulated much easier.

3            So the issue here --

4            If we can go to Slide 23.

5            We have a dispute as to what encompasses this

6    interface circuit.  We have identified everything between the

7    joystick and the processor, as it should.  It is what

8    interfaces the two.  They connect.  The interface circuit does

9    disconnect the joystick to the processor, and there is a lot

10   of buffer circuitry and peripheral circuitry right at the

11   processor that helps take those signals right into the

12   processor core, which is the one that is computing everything.

13   That is the processor.  So all of that circuitry right before

14   the core is operating at a low voltage, and they don't dispute

15   that.

16           THE COURT:  All right.  Thank you.

17           Mr. Cordell, do you have anything to add?

18           MR. CORDELL:  Yes, Your Honor, if I might.

19           MR. RIEDINGER:  Thank you, Your Honor.

20           MR. CORDELL:  My apologies, Your Honor.  I am going

21   to have to switch a cable.

22       (Pause in proceedings.)

23           MR. CORDELL:  Thank you, Your Honor.  May it please

24   the Court.  Ruffin Cordell from Fish & Richardson on behalf of

25   Microsoft.  I will do my best not to re-tread the ground that

1    Mr. Riedinger so ably presented; but the issues while common

2    in many instances, there are some differences.  And there are

3    some things that I would like to stress in particular about

4    the issues that we have before us.

5            If I could have my first slide, Slide 2.

6            The three issues that we briefed on summary

7    judgment, Your Honor, the now familiar first and second

8    voltage requirement that the interface circuit have a source

9    voltage lower than that of a joystick, I would like to focus

10   in on one of the elements within that particular claim

11   limitation, the buffer circuit, which I believe is about as

12   crystal clear as a summary judgment can be.  And then I would

13   like to touch on the pulse generator just a bit that Mr.

14   Riedinger also addressed.

15           So diving in, the fundamental dispute with respect

16   to the interface circuit, Your Honor, has to do with the

17   interpretation of how this claim is set up.  The slide that

18   Mr. Riedinger showed us from Fenner's Markman presentation is

19   just compelling.  We have out of the Fenners' own mouths, out

20   of their own lawyers' positions, the fact that the interface

21   circuit includes these two fundamental elements, a buffer

22   circuit and a pulse generator and those components that make

23   up the interface circuit operate at this second source

24   voltage.  Absolutely clear.

25           So we start with the fact this is what this patent

1    is all about.  It was this ability to create this adapter,

2    this ability to put something in between a Legacy joystick

3    that operated at a high voltage and a newer computer that

4    would allow the two to communicate.  And the claim is very

5    specific that this adapter, this piece that you put in between

6    had to operate at this lower voltage.  We see that from the

7    structure of the claims.

8         So looking at, for example, Claim 9 of the '751

9    patent, it tells us that the interface circuit has two

10   components; a buffer circuit and a pulse generator.  That is

11   it.  It doesn't have anything else.  It has the additional

12   limitation that the voltage of the interface circuit has the

13   second source voltage.  If we take Fenner's suggestion that

14   there is no requirement that the buffer and the pulse

15   generator have anything to do with the voltages, then it

16   renders the first part of that claim absolutely meaningless,

17   absolutely meaningless.

18        The only reason to have that introductory phrase,

19   "an interface circuit having a second source voltage" would

20   suddenly be deemed absolutely superfluous because the only two

21   elements that the patent claim itself tells us make up that

22   interface circuit are free of the only requirement that is

23   recited for the interface circuit.  That flies right in the

24   face of the plain language of this claim and in controlling

25   precedent.

1           THE COURT:  Let me get a response to that.

2           MS. QUINN:  Your Honor, the plain and ordinary

3    meaning of the claim is "a interface circuit having a second

4    source voltage that is lower than the first source voltage,

5    including," and then it recites the buffer circuit and the

6    pulse generator.  If you see Figure 2 that they just showed

7    you, Your Honor, there are a lot more components within that

8    interface circuit than just the buffer circuit and the pulse

9    generator.

10          THE COURT:  That is what I was going to ask, is the

11   interface circuit limited to the -- what were the two, the

12   buffer, pulse generator, buffer --

13          MS. QUINN:  Those would be the claim limitations,

14   but the embodiments shown in the patent have a lot more

15   components than just those two --

16          THE COURT:  As a matter of law are you limited to

17   what is recited in the limitation after "including" or can it

18   include more than that?

19          MR. CORDELL:  It can include more, Your Honor.  The

20   Court is exactly correct.  But my point is not that other

21   components could not be included.  My point is that the claim

22   tells us what the minimum components are.  The minimum

23   components are the buffer circuit and the pulse generator.

24   Those are the only two things that the claim tells us -- the

25   disclosed embodiments may have a lot of fruit salad, but the

1   claim tells us we have to have two things.  If we are to

2   relieve the claim of the only limitation that applies to those

3   two elements, the voltage limitations sound meaningless,

4   absolutely meaningless because there would have been no reason

5   for the patentee to have commented on the voltage level of the

6   interface circuit at all.

7           THE COURT:  Response?

8           MS. QUINN:  Your Honor, we don't believe that is

9   true.  If the patentee had wanted to put a lower source

10  voltage limitation on these two subcomponents of the interface

11  circuit, it would have done so.  It did it with the interface

12  circuit.  You don't have to have a lower source voltage within

13  every component --

14          THE COURT:  Every subcomponent?

15          MS. QUINN:  Every subcomponent to accomplish what

16  the patent accomplishes, which is to remove the voltage level

17  from the analog world and convert it all into something that

18  the processor can handle, which is in the digital world.  You

19  can manipulate that much easier.  If I may also, they said

20  something about it can't work that way, yes, it can.  There

21  are -- all it says it has to be within -- somewhere in that

22  interface circuit has to be in that lower voltage.

23          THE COURT:  And your expert draws the interface

24  circuit box a little larger than their expert does?

25          MR. GOVETT:  Correct, Your Honor.

1           THE COURT:  Why isn't that a fact issue?

2           MR. CORDELL:  Because, Your Honor, the claim tells

3    us where we have to draw the box.  Again, you can include

4    additional things if you would like, but we can't deviate from

5    the dictates of the plain language of the claim.  The claim

6    tells us that interface circuit is at a lower voltage, and it

7    tells us that there are two required elements of the interface

8    circuit.  If we are going to divorce those two, the claim

9    loses any definition whatsoever.  The tragedy in all of

10   this --

11          THE COURT:  Do you say that your product does not

12   have those two elements, or that they are at the same voltage?

13          MR. CORDELL:  We would say both, Your Honor, but we

14   stress the fact that they are at the same voltage.  We take

15   Fenner at its word.  I will show you in a moment the two

16   components that they pick as being the pulse generator and the

17   buffer circuit.  They also admit that both of those components

18   operate at the same or higher voltages than the joystick, so

19   it doesn't meet this very definite --

20          THE COURT:  I understand your point.  What is next?

21          MR. CORDELL:  So one other point on that, if I can

22   just stay with Slide 5.  We had a lot of discussion this

23   morning about the voltage of the processor, Your Honor.  You

24   can read the claims top to bottom, and you are not going to

25   see anything about the voltage of the processor.  That is not

1   what this thing is talking about.  It is agnostic as to the

2   voltage of the processor.

3           THE COURT:  But you have got an argument as to

4   where the processor starts and where the processor stops and

5   where the interface circuit starts and stops between your

6   experts, don't you?

7           MR. CORDELL:  Yes, we do.  Yes, we do.  But the

8   reality is I don't want this to be -- Fenner has characterized

9   this as a debate over whether or not the processor has to be

10  at a particular voltage.  That is not what the claim says.

11  The claim says show me that interface circuit having these two

12  components at the voltage --

13          THE COURT:  All right.  What is next?

14          MR. CORDELL:  I'd like to drive this home just a

15  bit, and I won't belabor this; but the quote that Mr.

16  Riedinger showed the Court from the prosecution history is

17  absolutely compelling.  This is a statement that then Lucent

18  made to the Patent Office in order to obtain allowance of the

19  claim.  A deal is a deal.  You can't retrade the deal now that

20  you are in litigation.  And they make it as clear as it can be

21  that at least the pulse generator has to be at the second

22  source voltage.

23          The "e.g." that Ms. Quinn referenced a few moments

24  ago, I have to take issue with her there.  She said, well,

25  that is just one example.  Well, the example is the kind of

1   low voltage circuitry that is used CMOS.  There are other

2   different kinds of electronics that could be incorporated;

3   TTL, there are a lot of different forms.  That is the "e.g."

4   So when you read the sentence in context, it makes it very

5   clear that the second source voltage lower than the first is

6   used to generate the pulse width.  Just as clear as they can

7   be.

8               THE COURT:  All right.  Anything further?

9               MR. CORDELL:  I would like to touch on the fact that

10   it is also included on Claim 14.  We have been focused on

11   Claim 9.

12              Next slide, please.

13              So just to drive it home, Your Honor, at Slide 8 we

14   have exactly the elements that their expert, Mr. McAlexander

15   points to.  He points to the comparator in the A/D converter

16   and says that is the buffer circuit, and he says USB block,

17   which is the same universal serial bus the Court has certainly

18   been familiar with in other cases, is the pulse generator.  No

19   dispute in this case that those operate at the same or higher

20   voltages than the joystick.  And what was shown in the

21   left-hand side of Slide No. 8 is a hand-drawing from Mr.

22   McAlexander's deposition where he himself circled these

23   elements and then tells us --

24              If I can have Slide 9.

25              -- that, in fact, they always operate at the same or

1    at a higher voltage.  Absolutely undisputed.  So the elements

2    he chose, I didn't choose them, he chose were the pulse

3    generator and for the buffer circuit; absolutely undisputed

4    they operate at the same or higher voltages.

5              Next slide, please.

6              In Slide 10 we just summarize the voltages.  Again,

7    there is no dispute on that.

8              Let me go to buffer circuit, Your Honor, because to

9    the extent there is a debate about the interface circuit, I

10   don't believe there is any room for debate about buffer.  The

11   Court's construction could not have been clearer.  The buffer

12   circuit is the circuit that separates the lower voltage

13   circuitry from the higher voltage circuitry.  It is the line

14   in Texarkana between the Arkansas and Texas side of the

15   Courthouses.  We know exactly where it is.  We know what has

16   got to be on one side and what has got to be on the other

17   side.

18             What do they point to as the buffer circuit?

19             Again, if I can have Slide 13.

20             They point to the comparator.  And the comparator,

21   Your Honor, it is undisputed sits in the middle of the same

22   voltage domain as the joystick, in the middle of the same

23   voltage domain as the joystick.  It is the same or in some

24   cases a higher voltage but never lower.

25             THE COURT:  Let me hear a response on the buffer

1    circuit.

2          MS. QUINN:  Yes, Your Honor.  We believe a buffer

3    and a comparator are virtually interchangeable.  A comparator

4    drawn as a little triangle, what does the patent disclose?  A

5    little triangle circuitry.  They do the same thing.  They make

6    sure that the input from one side does not affectedly adverse

7    the circuits on the other side.  We believe there is a fact

8    issue.  If I could show the Court line -- Slide 5.  Maybe that

9    is not the one.

10          But the point is that the isolation between the

11   circuits that occur before and after this comparator

12   accomplishes the separation.  And this is a technical issue

13   that the experts, I guess, will fight about, how much

14   separation is there.  Do you really have a circuit that

15   separates, as Your Honor put in the claim construction.

16   Because our expert believes that when you see a comparator,

17   electrical engineers know that is a buffer.  It isolates two

18   circuits side by side, and it makes sure that the signals

19   coming in from the analog world don't affect the digital side.

20   So we believe it meets the claim construction perfectly.

21          THE COURT:  Okay.

22          MR. CORDELL:  If could respond just briefly, Your

23   Honor.  That is an irrelevant point frankly.  Whether or not

24   the comparator can change something from analog to digital,

25   doesn't speak to the fundamental claim construction that the

1    Court gave us.  Where is the junction between high voltage and

2    the low voltage?  I dispute that a comparator is automatically

3    assumed as the junction between anything.  What it does is it

4    is a comparison.  It is to evaluate the level of voltage and

5    come up with a number.  That is its job.  Its job has nothing

6    to do with interfacing any two particular domains.

7            But the Court could not have been clearer, it has

8    got to be that interface.  And we focused on Claim 9 for this,

9    Your Honor, and I think, again, that Fenner did indicate that

10   Claim 9 was representative for the purposes of summary

11   judgment.

12           But we can also look at Claim 14 where it is

13   absolutely, again, crystal clear -- sorry.  Well, there we go.

14   In Claim 14 it tells us that the generating a digital

15   signal -- Ms. Quinn just said it is the triangles.  Again, I

16   would take issue with whether the triangles have a particular

17   meaning in this context.

18           But she is right, the buffer circuit are the two

19   operational amplifiers 222 and 224.  They are the buffer

20   circuit set forth in the patent.  And what the patent tells us

21   in Claim 14 is that that is the element that generates this

22   digital signal.  And it couldn't be clearer in the text of the

23   claim, the digital signal being generated by an interface

24   circuit having a second source voltage that is lower than the

25   first source voltage.  That is the element that does it.  It

1    has got to have that lower voltage.

2              Okay.  If I could touch briefly on the pulse

3    issues.  In the slides, Your Honor, we have testimony from Mr.

4    McAlexander.

5              Can I pause, on that, Lauren?  I'm sorry.

6              I just want to make it crystal clear there is no

7    dispute that the element he points to as the buffer circuit is

8    always -- is always operated at the same or higher voltage.

9    We have that in Slide 9.

10             Thank you.

11             So going to pulse generator, I won't spend too much

12   time on this because Mr. Riedinger, again, did a very good

13   job.  But the Court asked about how pulses are used in the

14   patent.  I think that is a very important point.  The way the

15   pulses are used in the patent is a very particular method of

16   communications.  It has been used for a long time.  It is very

17   common in electronics.  And what is done is you set a signal

18   high and you keep it high for a period of time.  You create a

19   pulse that can be timed on the other end of the circuit to

20   determine what information you are trying to convey.

21             The Court can imagine that if you keep the pulse up

22   for one millisecond well then that means one thing.  If it is

23   two milliseconds it means something else.  If it is 45.3, then

24   that means something else.  And what the patent tells us very,

25   very clearly at Slide 15 we show one of the figures, is that

1    the pulses vary in length based on the position of the

2    joystick.  So it is like 16 we show that when the joystick is

3    moved the signals change and the pulse gets longer to show the

4    joystick has been moved more.  It is a very simple approach,

5    very straight-forward.  But make no mistake, Your Honor, these

6    are pulses.  This is a single cycle of variation in level.  It

7    goes up, it stays up, and that is the information that is

8    conveyed.

9              It is not a series of serial bits that are

10   aggregated together because you happen to find a series of 1's

11   in a row.  This is a different animal, a fundamentally

12   different technology.

13             Slide 17.

14             What is it that the accused products do?  And this

15   is true for both Nintendo and Microsoft.  What they do is they

16   spend the extra money to go ahead --

17             THE COURT:  Haven't we covered all of this?  Isn't

18   this pretty much the same thing?

19             MR. CORDELL:  It is, Your Honor.  If I could just

20   make one quick point?

21             THE COURT:  All right.

22             MR. CORDELL:  That A/D converter that we put out in

23   the controllers themselves, is an expensive component.  We

24   have done the extra work at the other end of the system so

25   that you don't have to deal with this pulse communication

1    anymore.

2            Slide 18.  Let's keep going.

3            So I would like to just touch on one thing.  At

4    Slide 19 we have Mr. McAlexander's concept of what could be a

5    pulse.  There is no way, there is no engineer on the planet

6    that would look at one of these and say that it is -- it

7    conveys joystick position.  He looks at a series of pulses as

8    was shown here in Slide 19.  He said that is what you need to

9    convey joystick position.  It is undisputed that you need 10

10   bits in the Microsoft system to convey joystick position.

11           So what Mr. McAlexander has to do is he has to

12   aggregate these 10 bits, he has to have them side by side in

13   the hopes that every now and then a few 1's fall in a row and

14   it looks like a pulse.  That is what he is doing.  That is

15   what is fundamentally going on here, and that is the

16   fundamental summary judgment issue.

17           Slide 20.

18           It is undisputed, Your Honor, that when he looks at

19   the USB interface the thing that he says is the pulse

20   generator, that it is always a sequence of pulses, it is

21   always creating more than one pulse.  What he says is, there

22   is more than one pulse, as we have already discussed, to

23   encode a particular coordinate position, such as the "X"

24   position of a particular joystick.  It requires, as a minimum,

25   a 10 bit resolution -- I'm sorry -- a 10 bit position to

1    encode that 10 bit resolution.  Got to have 10 bits;

2    absolutely undisputed.

3              Next slide.

4              Mr. Riedinger touched on this, so I won't.  The

5    reality is, the fact that you can find a series of 1's in a

6    row doesn't convert a serial bit stream in a pulse.  It is

7    still a series of bits.  And those series of bits have meaning

8    only because they are 1's and 0's in a particular position

9    within the word.  So if you have three 1's at the end, that is

10   not the same thing as three 1's at the beginning.  That is

11   like saying one million dollars is the same thing as $100.

12   The position within the word is what gives the information to

13   the processor.

14             So what we have shown in Slide 21 is that you could

15   have five bits that are high.

16             If I can go to 22.

17             We show that you can put those five bits in

18   different positions within the word, and they have radically

19   different meanings.  The width, even if you are going to

20   accept that is a pulse width, the width of that pulse does not

21   tell you what the joystick position is.

22             One thing that I want to make clear is that the

23   encoding that Microsoft uses is called NRZI and it ensures

24   that you never have more than five 1's in a row.  If you have

25   that, the system is stuck so it puts a 0 in, so you always --

1    you never have one longer than five, so as a result you always

2    need more than one of Mr. McAlexander's pulses to represent

3    the information.

4              If I could have two seconds on the doctrine of

5    equivalents, Your Honor.  The reality is that the fundamental

6    claim limitation here requires that a pulse width convey

7    information, a pulse width conveys the information.  If you

8    are going to -- if we are going to ignore that, we would

9    absolutely remove that element, that is claim vitiation.  It

10   is not allowed under the All Elements Rule.  It is in our

11   brief, and I have got it at Slides 24 and 25.

12             Thank you, Your Honor.

13             THE COURT:  Okay.  Thank you.

14             All right.  The Court is going to carry the motion

15   for summary judgment along through trial.

16             MR. RIEDINGER:  Your Honor, if I could?

17             THE COURT:  Yes.

18             MR. RIEDINGER:  Since you are doing that, and I can

19   certainly appreciate that is a good thing for the Court to do,

20   but we believe that it is apparent there is a disagreement

21   between the parties as to the claim terms.  We don't think

22   that there should be a disagreement, but they seem to be

23   interpreting Your Honor's constructions differently than we

24   are.  If you could provide us some additional help on that, I

25   think that would simplify a lot of the issues for trial.

```
 1          THE COURT:  Well if you wish to file a motion for

 2   clarification and get a response in, I will try to do that.

 3          MR. RIEDINGER:  Thank you, Your Honor.

 4          THE COURT:  All right.  We are going to take about a

 5   ten-minute break, and we will come back and get into the

 6   motions in limine.

 7      (Recess was taken at this time.)

 8          THE COURT:  Please be seated.

 9          All right let's go into the motions in limine.  And

10   I have the parties' joint notice regarding status.  I guess

11   that would probably be the best way to work.  I would hope

12   that y'all have resolved some more of these since my rulings

13   this morning.

14          MR. GOVETT:  I believe so, Your Honor.  If I can

15   just kind of motor through ours.

16          THE COURT:  All right.

17          MR. GOVETT:  On the first one, we resolved some of

18   it, but I want to emphasize a point --

19          THE COURT:  Which one are you on?  A?

20          MR. GOVETT:  Yes, sir.  Fenner's Motion in Limine

21   No. A.  I want to emphasize the point, if I may, I am going to

22   hand up Page 63 of Dr. Ugone's report, which is in the

23   evidence on the Ugone motion.  And if you will look at the two

24   paragraphs that I highlighted there.  Okay.  That's it.  The

25   Court said he can't get into these settlement agreements.
```

1   There is no cap.  That's his opinion.  That's his report.

2   Without the settlement agreements, without the cap, there is

3   nothing left.

4           So, again, it is our position that what is it that

5   Dr. Ugone is going to be testifying about?  We don't think

6   there is anything, nor do we believe that his testimony is

7   proper in light of the Court's ruling, so that is really what

8   our Limine No. 1 is about.

9           THE COURT:  Okay.  Response?

10          MR. JONES:  Yes, Your Honor.  Again, I thought this

11  had been taken care of when we argued the prior motion.  He

12  testified that the basis for the cap in his report was not

13  only the settlement agreements and looking at the comparative

14  value of the patent, but he also discusses the fact in his

15  report that there are noninfringing alternatives that could

16  have been used that would have had a cost.  And that cost

17  would have put a limit on the cap.

18          Further he has also testified -- not testified, but

19  stated in his report that he has looked at the comparative

20  value of this particular patented technology and what is

21  included in these games and in these consoles and in these

22  controllers and he found it rather limited.  He also said in a

23  footnote to his report that his opinion with regard to the

24  five million dollar cap would not change even if he did not

25  rely upon those settlements.

1      MR. GOVETT:  There is no basis for it.  That is the

2  point.  He just says, well, it wouldn't change --

3      THE COURT:  Y'all have my ruling, and when we get to

4  trial you can object if they offer something that violates

5  that.

6      MR. GOVETT:  Okay.  The only thing that I want to

7  point out, Your Honor, in order to effectively cross-examine

8  him -- he will say those things.  But in order to effectively

9  cross-examine him on this point, he is going to say it is five

10  million dollars, it is capped, you can't go above.  Then they

11  are going to say, well, you opened the door because that is --

12      THE COURT:  No, you won't open the door if you ask

13  him what is his basis.  He is not going to testify as to any

14  of the settlement agreements, right?

15      MR. JONES:  That's correct, Your Honor.

16      THE COURT:  Okay.

17      MR. JONES:  So I understand the motion in limine,

18  the motion is limine is sustained to the extent that he is not

19  to testify as to any of the settlement agreements, right, Your

20  Honor, except for the one by which the patent was acquired?

21      THE COURT:  Right.

22      MR. GOVETT:  Okay.  Your Honor, I think that brings

23  us down to D about the other patents other than the one in

24  dispute.  Just for the Court's reference, we took D -- it is

25  something we would have had in here anyway.  We took it from

1    the Ergotron case.  It was granted, if that is helpful at all

2    to the Court.  D, you can't talk about your other patents.

3            MS. DEGNAN:  Okay.  Well, if I could respond, Your

4    Honor, this is Lauren Degnan for Microsoft.  Two points

5    really.  First, in terms of prejudice, there really is not

6    prejudice.  We certainly have no intent and no plan to kind of

7    wave our own patents around as if they were some sort of

8    permission slip to use the patented invention, and there

9    certainly could be a jury instruction to say that effect.

10           But we find they are relative for a couple of

11   reasons.  They are part of the development story of the

12   accused products.  They show that the accused products have

13   numerous different features.  For example, the Xbox, you can

14   download movies and watch them from Netflix.  There are a lot

15   of things that go on.  There are a lot of patents that are

16   associated with them.  And, finally, it helps the jury

17   understand the unreasonableness of Mr. Bratic's reasonable

18   royalty calculation where he opines that the damages should be

19   three to five percent royalty on the revenue entirely; and if

20   you took a five percent reasonable royalty if you had more

21   than 20 patents on a product -- and in Microsoft's case --

22   you know, Microsoft itself has over 30 patents on its

23   products, no revenue left at all.

24           So we find there is a probative value associated

25   with these; and with the proper instruction, there is

1    absolutely no prejudice whatsoever.

2          MR. GOVETT:  Obviously, we would disagree with that,

3    Your Honor.  If they want to tell a story about the accused

4    products, the evolution of them, they can get into that

5    separate and apart from any patent that might be on the

6    accused product.

7          THE COURT:  All right.  I am going to grant D.

8          What's next?

9          MR. GOVETT:  Your Honor, it is E.  And our position

10   on E is that, basically, unless it is in an expert report,

11   vis-a-vis, prior art compared to the claims, you ought not to

12   be able to come in here and roll out all this sort of prior

13   art, and then the Court gives a jury charge that says is the

14   patent invalid in light of the prior art?  And there is all

15   this prior art essentially wandering around in the courtroom,

16   but it has not been linked up, it has not been linked up

17   through an expert and so forth.

18         So our position on E is that if you want to work

19   with prior systems and so forth, it needs to be linked to the

20   claims, and it needs to be addressed in an expert report in

21   order to come into evidence; otherwise, it has no place in the

22   case.

23         THE COURT:  Okay.

24         MS. DEGNAN:  In response we would say they are

25   trying to unfairly hamstring our ability to talk about the

1   patent itself, which goes into prior art; and talk about how

2   our own products were developed based on previous products

3   that would qualify as prior art, so we think this is overly

4   broad.  There is no prejudicial value whatsoever.  The jury,

5   in fact, would be helped by learning the development of our

6   products.  And to the extent that touches on prior art, there

7   is certainly no -- it is relevant, and it is certainly not

8   prejudicial.

9          MR. RIEDINGER:  Your Honor, if I may, our products

10   that are accused of infringement are the direct descendants of

11   our prior products.  The people who worked on, for example,

12   the GameCube worked on the previous product; and many of the

13   features of the previous product were incorporated into the

14   GameCube.  So they would be preventing us from describing the

15   design and development of the GameCube if we couldn't talk

16   about what went into the GameCube.

17          In fact, the signals that they say are pulse having

18   a width representing joystick position, those were used in our

19   prior product.  So that what they are trying to do is stop us

20   from describing how our products were developed and have half

21   a story presented to the jury.  What we should be able to do,

22   Your Honor, is describe the development of our products and

23   describe what went into those products.  We are not trying to

24   back-door arguments on invalidity.

25          MR. GOVETT:  They haven't produced any documents

```
 1    which show that, Your Honor.  That is a separate issue.  Of
 2    course, they want to talk about prior art in the patent, that
 3    is fine.  If they want to talk about how this product evolved,
 4    you know, without getting into all this other stuff, they
 5    ought to be able to do that.  This is the first product for
 6    both of them.  The Xbox and the GameCube are the first
 7    products that used this type of joystick, this analog type of
 8    joystick that we are talking about here.
 9              MS. DEGNAN:  I would take issue, Your Honor, in
10    terms of the facts in terms of what Microsoft had done.
11    Microsoft had joysticks prior to the Xbox product, and the
12    Xbox product was derived from the previous Microsoft software
13    platform.  And so I think Mr. Govett is, perhaps, raising a
14    fact issue he can cross-examine our witnesses on.
15              THE COURT:  All right.  Now, I will allow you to go
16    into the development of your product, but I don't want to go
17    into detail, functionality comparisons between the prior art
18    and the accused products.  All right.
19              MR. GOVETT:  Your Honor, the next one -- I believe
20    you addressed F on the assignor estoppel already, so we have
21    the Court's ruling on that, I believe.  G is taken up as
22    well.  H is agreed.  I, if I might hand up to the Court, this
23    is the declaration for I.  It was part of our evidence in the
24    summary judgment issue.
25              THE COURT:  Okay.  What is the issue?
```

```
 1              MR. GOVETT:  I'm sorry?

 2              THE COURT:  What is the issue?

 3              MR. GOVETT:  The issue is that this attempts to

 4   corroborate -- this witness was not even employed at the time

 5   of these documents, and it is hearsay basically.  It ought not

 6   to come in or be used as part of the evidence in the case.

 7              THE COURT:  Response?

 8              MR. RIEDINGER:  Your Honor, this is a Rule 902

 9   declaration intended to authenticate documents that were kept

10   in the regular course of business at Hewlett-Packard.

11   Hewlett-Packard acquires Compaq, and this is the person that

12   provided the authentication specified by Rule 902 so that the

13   authentication problem doesn't exist.  And, of course, it is a

14   business record and, therefore, there is no hearsay problem.

15              THE COURT:  Okay.  I is denied.  What is next?

16              MR. GOVETT:  May I point out one other thing, Your

17   Honor?  The date of execution wasn't timely provided as well.

18   This was provided in December.

19              THE COURT:  December?

20              MR. GOVETT:  Of 2008.

21              THE COURT:  Still denied.

22              What is next?

23              MR. GOVETT:  J.  This, again, was taken from

24   Ergotron where it was granted.

25              MR. CORDELL:  I guess I would take issue with that,
```

1    Your Honor.  I think this is a new issue.  This has to do with

2    the tax returns and valuation of the '751 patent as it was

3    acquired.

4           THE COURT:  Okay.  I'm going to grant it at this

5    time but just approach.  On all of these rulings, you know,

6    just don't bring it up in front of the jury without

7    approaching.

8           MR. CORDELL:  Can I just ask Mr. Govett what it is

9    he thinks was subsumed by the prior ruling?  Because I see

10   this as a very separate issue, Your Honor.  This has to do

11   with the fact that when the patent was acquired, Mr. Fenner,

12   as a matter of his internal accounting, gave it a valuation;

13   and that valuation we think is highly relevant to the damages

14   issue.  The Integra Lifesciences v. Merck decision from the

15   Federal Circuit dealt with a somewhat similar situation

16   wherein a company had a bunch of patents and a company was

17   acquired for $20 million and the Court found that a $15

18   million royalty could stand because of the disparity in the

19   valuation of the patents versus the royalty.  So we think that

20   the fact that Mr. Fenner gave it no value in his tax returns,

21   gave it no value in his dealings with the Fulbright Law Firm,

22   is highly relevant to the damages issues in this case.

23          THE COURT:  Okay.

24          MR. GOVETT:  It is completely irrelevant, Your

25   Honor.  The way the Fenners valued the patent, they are on the

1   income valuation system.  When they get income in, they pay

2   tax on it.  If the patent has a value of $100 million, how are

3   you going to pay the tax on it?  And what we are saying here,

4   consistent with what we said in the other case, is that is a

5   red herring before the jury.  401, 402, they want to say you

6   cheated on your taxes.  That is clearly what they want to get

7   before the jury.

8          MR. CORDELL:  We don't, Your Honor.  We absolutely

9   will never say he cheated on his taxes.  What we will say is

10  that he had a decision to make.  He had a decision to make

11  when he received this intangible asset to give it a value of

12  one dollar, a million dollars, or zero dollars.  He chose zero

13  dollars.  We are not going to suggest that he lied to anybody.

14  We are going to say he was very truthful about what this

15  patent was really worth, both on the books of Lucent and on

16  the books of this defendant.

17         THE COURT:  I'm going to grant it for now.  I'm

18  going to take a closer look at it.  I may be inclined to allow

19  it in.  Just bring it back up outside the presence of the

20  jury.

21         MR. CORDELL:  Thank you, Your Honor.

22         MR. GOVETT:  K, Your Honor.  They want to be able to

23  talk about that we had a contingency interest in any Fenner

24  case.

25         MR. CORDELL:  Your Honor, this has to do with a

1    related issue to the valuation issue because the prior

2    litigation wherein Mr. Fenner received this patent, the

3    Fulbright Law Firm had a contingent interest.  So we asked him

4    in his deposition did anybody else give the patent a

5    valuation?  He said yes.  And we asked who?  He said the

6    Fulbright Law Firm gave it a valuation as part of their

7    contingent fee arrangement.  We don't want to mention

8    contingent fee, we don't want to say anything about that.

9    What we want to say is that the Fulbright Law Firm had their

10   own pecuniary interest in the '751 patent, and they gave it a

11   zero dollar valuation.

12           THE COURT:  I'm going to grant K.  What is next?

13           MR. GOVETT:  Your Honor, L has been taken care of

14   already.  M, I have got the deposition -- just guide us in

15   that personal knowledge.  How would you like for us to handle

16   that?  It is something that I think the Court may want to look

17   at.

18           THE COURT:  Response?

19           MR. RIEDINGER:  Your Honor, they are simply arguing

20   the weight.  He did testify as to a number of things that he

21   obtained as a corporate representative.  That is how corporate

22   representatives obtain information.  They study the

23   information in the corporate records and documents.  That is

24   what he testified to.  It is simply a question of weight, Your

25   Honor, they can argue.

1              THE COURT:  All right.  Denied.

2              The next one?

3              MR. GOVETT:  P, reexam, Your Honor.

4              MR. RIEDINGER:  I sat down too quickly.

5              MR. GOVETT:  Do you want me to argue that?

6              THE COURT:  No, that is okay.  Response on P,

7     reexamination?

8              MR. RIEDINGER:  Your Honor, we have a contingent

9     motion on this.  And our only point is not that we want to

10    bring up the reexamination in a vacuum, we only want to bring

11    up the reexamination if the other side -- if Fenner starts

12    arguing that this patent went through a thorough and complete

13    examination in the Patent Office that resolved all of the

14    issues.  We expect them to be arguing that.  We expect them to

15    argue that the patent has a presumption of validity, which, of

16    course, under the law it does.  So what we want is for the

17    opportunity to present both sides of the story so the jury can

18    have a balanced view.

19             The Patent Office has said that there is a

20    substantial new question of patentability; therefore, they

21    should not be able to argue that the activity in the Patent

22    Office was in any way a complete examination that resolved all

23    of the issues.

24             THE COURT:  P is granted.

25             What is next?

1          MR. GOVETT:  Yes, Your Honor, R.  And R is the issue

2     with respect to what they want to do with experts and so

3     forth.  We are saying -- and, by the way, this one also was

4     taken from the Ergotron case, Your Honor.  It relates to the

5     Ugone that they have.  We are saying all that stuff, vis-a-vis

6     other cases, ought to be out of the mix.  They proposed

7     sometime last night to me, we will agree with you on Bratic

8     and Ugone but there are other experts, too.  And part of your

9     exhibits that you provided to us are testimony and so forth

10    related to, for example, Mr. McAlexander.  The jury ought to

11    hear about this case, these facts, the opinions related to

12    that.  Not some other case.  It is just getting off into

13    something we don't have to get off into.

14          THE COURT:  Response?

15          MS. DEGNAN:  We think this is fair

16    cross-examination, and the exhibits were put on the list for

17    the purposes of impeachment.

18          THE COURT:  All right.  I'm going to grant R.  What

19    is next?

20          MR. GOVETT:  Your Honor, W and X -- to hurry things

21    along here, if I might address them -- you might have already

22    addressed this with respect to what you talked about on the

23    fact witnesses.  But W and R have to do with the infringement

24    experts, not the invalidity experts but the infringement

25    experts go through, oh, this happened in the prior art, this

1    happened in the prior art, this happened in the prior art, all

2    in an attempt to minimize the invention, which the Court has

3    construed and so forth.  They do it in their infringement

4    reports.  They have completely separate issues for validity

5    experts.  I can provide the pages if the Court wishes.  But

6    that is the issue they ought not to be able to get into that;

7    to basically redefine the invention as something other than

8    what is in the claims and minimize the invention as something

9    other than in the claims --

10              THE COURT:  Response?

11              MS. DEGNAN:  I think he is mischaracterizing what

12   this evidence is useful for.  In terms of talking about an

13   expert's own background in the prior art, the patent itself

14   talks about the prior art.  The experts who have reviewed the

15   patent should be able to place the field of the invention in

16   the context of the prior art to the extent it has been

17   disclosed in their expert reports.

18              The second part of this motion is they don't want us

19   to talk about the preferred embodiment in any way in front of

20   the jury, which is absurd.

21              THE COURT:  Talk about what?

22              MS. DEGNAN:  The preferred embodiment of the

23   invention in any way in front of the jury.  We are certainly

24   committed.  Our experts do take the claims as construed by

25   this Court and apply them to the accused products.  That is

1    the basis of their noninfringement opinions; nevertheless,

2    routinely people look at parts of the specification to explain

3    the technology to the jury, to help them understand the

4    context of the invention.  And I think they are really trying

5    to hamstring and make this very much in a vacuum and deny the

6    jury information about the context of the invention and the

7    patent itself.  We think that is completely inappropriate,

8    highly relevant, and not remotely prejudicial.

9            THE COURT:  All right.  It is denied as to the

10   preferred embodiment, but granted as to the other parts.

11           What is next?

12           MR. GOVETT:  Yes, Your Honor.  On CC your ruling on

13   the contingency should address the one disputed point.  The

14   last line of CC was disputed.  No reference should be made to

15   the terms of engagement of Counsel for Fenner as they have

16   nothing to do with issues before the jury.  I believe that has

17   been addressed.

18           MS. DEGNAN:  That's right it has, Your Honor.

19           MR. GOVETT:  EE, Your Honor, if it is superseded

20   pleadings or infringement contentions -- invalidity

21   contentions, too, for that matter; all of the stuff that is

22   prior -- is off the table, out of the case.

23           MS. DEGNAN:  We would say they can't just -- they

24   have not and cannot supersede their infringement contentions.

25   They presented a shifting sand theory of infringement here.

1    To the extent their theory has changed over time is plenty

2    good fodder for cross-examination.  We should be entitled to

3    talk about it.

4              With respect to the pleading issue, I have to raise

5    the issue of Sony.  In connection with now what is a jury

6    issue on marking and compliance with Section 287, the fact

7    that they sued Sony represented that Sony was an infringer, is

8    highly relevant to that issue.  So to the extent they are

9    trying to exclude references to Sony via this amended

10   complaint, we think it is appropriate.

11             THE COURT:  Response?

12             MR. GOVETT:  Yes, Your Honor.  That is getting to MM

13   also about Sony.  The Sony issue -- the fact of suit and so

14   forth against Sony is a completely separate issue.  We are

15   talking about superseded pleadings and so forth and superseded

16   infringement contentions --

17             THE COURT:  Without getting into the Sony issue, EE

18   is denied.

19             Okay.  What is next?

20             MR. GOVETT:  FF, we are talking about the Court's

21   rulings with respect to claim constructions, evidence related

22   to unasserted claims.

23             MS. DEGNAN:  He doesn't want us to talk about

24   unasserted claims in front of the jury in any way.  Again, the

25   entire patent is relevant; and to the extent there is

1  something to be said about claims that are not asserted, the

2  jury is entitled to know about that.  And, for example, right

3  now they have asserted 14 claims --

4            THE COURT:  Right now what?

5            MS. DEGNAN:  Fourteen, we dearly hope they reduce

6  the number of claims before we get to trial; but if they do,

7  this is kind of open-ended and they can choose at their

8  leisure to drop a claim and preclude us from talking about

9  portions of the patent.

10            THE COURT:  When are you going to decide which

11  claims you are going to go to the jury on?

12            MR. GOVETT:  For sure before voir dire unless you

13  want us to do it earlier.

14            THE COURT:  Is voir dire early enough for you?

15            MS. DEGNAN:  Earlier the better --

16            THE COURT:  Let's see, voir dire is on Tuesday?

17            MR. GOVETT:  Yes, sir, March 2nd, Tuesday -- sorry,

18  Monday, March 2nd.

19            THE COURT:  Why don't you do it by the Friday before

20  that so they will knowledge of which claims you are asserting.

21            MR. GOVETT:  Sure.

22            MS. DEGNAN:  Putting that issue aside --

23            THE COURT:  Excuse me?

24            MS. DEGNAN:  Putting that issue aside, I think it

25  is still relevant to be able to talk about anything that is in

1    the patent before the jury.

2           MR. GOVETT:  But they don't have any expert that is

3    discussing -- I mean, if we drop it --

4           MS. DEGNAN:  Reading your ruling -- your motion,

5    Your Honor, we could say -- we could not literally say the

6    claim has 16 patent claims only four of which are asserted,

7    which I think is inappropriate.  They are going to be able to

8    read the cover --

9           THE COURT:  I will allow you to discuss the patent

10   generally, but I am going to grant it to the extent of getting

11   specifically into certain unasserted claims and what bearing

12   they might have in relation to something else.  Okay?

13          MR. GOVETT:  That would include claims that are

14   dropped, Your Honor?

15          THE COURT:  Right.

16          MR. GOVETT:  HH, I can argue it but it is pretty --

17          MS. DEGNAN:  I mean, if he doesn't want to argue,

18   let me explain our objection to this then, Your Honor.  We

19   understand that the jury will see the FJC patent video and we

20   should be able to comment on what goes on in the Patent Office

21   based on that video.  Nobody is ever allowed to depose an

22   examiner so there will never be testimony or evidence that an

23   examiner did not do his job.  But that is really the gravamen

24   of an assertion of invalidity, which is what we are doing in

25   this case.  We think this is overly broad, and we should be

 1   able to talk about what goes on in the Patent Office as

 2   supported by the video.

 3            THE COURT:  Well, I think you can comment on what

 4   what is on the video, but nothing really beyond that.  Okay.

 5            MR. GOVETT:  Okay.  Your Honor --

 6            THE COURT:  Unless it is supported by testimony or

 7   evidence.

 8            Okay.

 9            MR. GOVETT:  JJ is the next one.

10            MS. DEGNAN:  Let me just explain, we have agreed

11   that no one intends to call the Fenner entity or Mr. Fenner a

12   pirate troll -- a patent troll or a pirate.  Our problem is

13   with this ambiguous phrase, "other like derogatory terms or

14   phrases."  And this is an order of the Court -- we need to

15   have very specific guidance on this point so we are not

16   violating it inadvertently.  It could happen, Your Honor, that

17   during cross-examination Mr. Fenner looks like a liar and that

18   is a derogatory phrase, but we should not be hamstrung to --

19   in fact, by your ruling have to hold Mr. Fenner and the

20   company up on a pedestal as a pillar of good moral standing.

21   You know, we have an opportunity to cross-examine, and I am

22   concerned about other like derogatory terms and phrases being

23   completely open-ended --

24            THE COURT:  This just refers to money made by Fenner

25   or the wealth of Fenner or any related entity.

```
 1              MS. DEGNAN:  My apologies, I jumped ahead.
 2    II -- we were on II, weren't we?
 3              MR. GOVETT:  No, JJ.
 4              THE COURT:  Which one is next?
 5              MR. GOVETT:  I'm sorry, the ruling on JJ, Your
 6    Honor?
 7              THE COURT:  Granted.
 8              MR. GOVETT:  Thank you.
 9              MS. DEGNAN:  I'm sorry, I didn't get to -- I'm
10    sorry, Your Honor, on JJ let me offer a response.
11              THE COURT:  All right.
12              MS. DEGNAN:  The issue is that we want to be able to
13    talk about the transaction in which Mr. Fenner obtained the
14    '751 patent.  That transaction was part of the Lucent
15    settlement.  And as compensation for granting a license and
16    release, he received $550,000 and this patent.  So we feel the
17    entire transaction is relevant.  That is the only thing we
18    want to talk about.  We do not want to talk about wealth in
19    general.
20              THE COURT:  I don't have a problem with that.
21              MR. GOVETT:  We have agreed with that.
22              MM, I think is where we are on the Sony issue.  We
23    sued them, we dropped them.  They are not in the case anymore.
24              MR. BROADDUS:  Your Honor, I believe the fact that
25    Fenner sued Sony is an additional fact that goes to the
```

1   marking issue the jury should be entitled to hear, along with

2   Mr. Fenner's testimony that Sony produced the products that

3   were covered by the patent.  The only reason Sony was dropped

4   from the case is because of Sony's license.  So the jury

5   should hear the whole story and not just pieces of it.

6           THE COURT:  Response?

7           MR. GOVETT:  Yes, Your Honor.  Sony is not going to

8   be in the case, so, you know, the issue of what Sony --

9       (The mouthpiece fell off the microphone.)

10          MR. GOVETT:  That is the second or third time I have

11  done that standing here -- not today, but in prior times that

12  I stood up here.

13          What Sony did, how the Sony products work, so on and

14  so forth, he doesn't have anything to do with the case.  If

15  they want to -- if the Sony issue is around and the Court

16  feels it is appropriate at the time that the case gets

17  presented to the jury, they can talk about did you sue Sony?

18  Were they dropped?  Yes, they had a license.  We don't have a

19  problem with that.  But it could open the door to a lot of

20  nuts and bolts, vis-a-vis, how does the Sony product work?

21  Where is your proof, Mr. Defendant, about what Sony did?

22  Because really the law on that, Your Honor, is that they have

23  to prove that the Sony product infringes the same way we have

24  to prove their product infringes.  Zero expert proof on that,

25  none whatsoever.

1          MR. BROADDUS:  Well, Your Honor, we disagree with

2    the burden of proof that Mr. Govett just described.  We

3    believe the burden is on Fenner and not on the defendants.

4    And this is something that Fenner should have to explain.  He

5    said that the Sony products were covered by the patent, he

6    sued Sony, Sony was dropped --

7          THE COURT:  Do you have any case law that says the

8    burden shifts to him just because he asserted a claim, that it

9    was covered by the patent?

10         MR. BROADDUS:  Yes, Your Honor.  We have case law

11   that the burden on the marking issue overall is on the patent

12   owner.  There is --

13         THE COURT:  Well, they have the burden on marking,

14   but don't you have the burden to show that the Sony product

15   was covered by the patent?

16         MR. BROADDUS:  No, Your Honor.  Mr. Fenner has

17   already admitted that, and that is --

18         THE COURT:  That is what I am asking you.  Assuming

19   you have that burden on the marking, let's say he had not

20   admitted that, would you have the burden to show that the

21   accused product that was not marked was covered by the patent?

22         MR. BROADDUS:  We would have the burden to show that

23   there were products that were unmarked that were covered by

24   the patent.

25         THE COURT:  Okay.  So absent his alleged admission,

1    do you have any proof of that?

2            MR. BROADDUS:  Well, the fact that Sony was sued as

3    part of the proof --

4            THE COURT:  Aside from the fact that he sued them or

5    alleging it was covered, do you have an expert that has done

6    an analysis of the product and testified that it was covered

7    by it?

8            MR. BROADDUS:  No, Your Honor, that is not our

9    theory.  We have not done that analysis.  We don't --

10           THE COURT:  You are relying on the fact that Mr.

11   Fenner sued them; and that he said he thought it was covered

12   by the patent?

13           MR. BROADDUS:  Yes, along with the fact that Sony

14   was licensed and later dropped from the suit.

15           THE COURT:  Do you have any law that says that that

16   is enough or that shifts the burden to them to prove that it

17   is not covered?

18           MR. BROADDUS:  Yes, once Mr. Fenner's testimony in

19   particular that the Sony products were covered by the patent,

20   we believe the law squarely places the burden on Fenner to

21   prove that those products were marked.  And Fenner has

22   produced no evidence.  We don't believe there is any evidence

23   that Sony marked anything with the '751 patent.  We have

24   looked.  We found nothing.

25           THE COURT:  Do you have any cases, though, that,

1   aside from his burden to prove that it is marked, do you have

2   any cases to prove that it becomes his burden to prove that

3   the Sony product is not covered by the patent; that the claims

4   are not covered by the Sony products?

5           MR. BROADDUS:  No cases directly on that point, Your

6   Honor.  But once Fenner sues Sony, that shows that Fenner

7   believed that the products were covered by the patent.  At

8   that point they do have the burden to show that the products

9   were marked.

10          THE COURT:  And you have got cases that say that his

11  belief alone is enough?

12          MR. BROADDUS:  Not that his belief alone is enough,

13  but the fact that there were products that Sony produced that

14  were licensed; that Fenner asserted were covered by the

15  patent, we believe that is sufficient for Fenner to have the

16  proof that the products were marked; and the fact that Sony

17  was sued, helps us prove that point.

18          MR. GOVETT:  Your Honor, we sued Microsoft and

19  Nintendo and Mr. Fenner believes the products are covered by

20  the patent, so why are we here?  That is the line of argument

21  that he is presenting to the Court.  That ought to be the end

22  of the inquiry --

23          THE COURT:  MM is granted.

24          What is next?

25          MR. GOVETT:  It is NN, Your Honor.  Basically, it is

1   similar to what we talked about before.  They put some things

2   on the 282 notice with respect to NN, never produced them in

3   the context of the case.  We believe what they want to do is

4   come in and have some engineer, fact witness, whoever,

5   particularly Nintendo -- JoyBus, JoyChannel, this PIf.  There

6   is no discovery whatsoever on that -- and talk about, well,

7   this was out there, this was out there, this was out there and

8   leave it in the room that when the question comes is Claim 9,

9   say, invalid in light of the prior art, you know, either in

10  closing or during the course of the evidence, you heard all

11  about the prior art; and, of course, this would be part of the

12  argument that would be subsumed within that.  We think it is

13  improper.  There has been no expert testimony on these devices

14  whatsoever.

15          THE COURT:  Response?

16          MS. DEGNAN:  Maybe Mr. Riedinger had something.  I

17  thought we had agreed that we were not going to have fact

18  witnesses do any comparison between the patent claims and

19  their products or any prior art.  Microsoft can live with

20  that.

21          MR. RIEDINGER:  We thought we had that agreement, as

22  well, Your Honor.

23          THE COURT:  That is agreed to then, NN.

24          MR. GOVETT:  OO, it is on the laches, Your Honor.

25  How does the Court handle laches?  Does it go to the jury for

1    an advisory opinion?

2              THE COURT:  No.

3              MR. GOVETT:  I'm sorry?

4              THE COURT:  No.

5              MR. GOVETT:  Then I don't see why OO would be --

6              THE COURT:  Anything else?

7              All right.  Microsoft's motion.

8              MS. DEGNAN:  Your Honor, the first one for Microsoft

9    has to do with excluding certain tests that Mr. McAlexander

10   did.  There is a little bit of a ramp-up on this.  I

11   apologize.  The day before we deposed him in November, Fenner

12   served a supplemental expert report containing a bunch of test

13   data the day before the deposition.  We deposed him.  We were

14   obviously a little hindered in that regard.  Two months later

15   in January they produced a video relating to those tests.  But

16   earlier in December we said we want to come and inspect and

17   test the equipment that Mr. McAlexander used in order to

18   conduct those tests.  Fair discovery request.  Come and

19   inspect the tests.

20             They denied it.  We tried to meet-and-confer.  The

21   briefing kind of sets forth the history.  First it was no.

22   Following up said, no, we found that -- we had Local Counsel

23   speak -- we figured we had to have Local Counsel on the big

24   summit anyway before we could bring a motion to compel.  The

25   answer continued to be no.  We did have a big summit, motion

1    to compel, at which time Mr. Chiaviello said, well, you know,

2    I see -- maybe we can say, yes.  Let me just check with the

3    expert.  Another week and a half goes by, the answer is no.

4    So that was two weeks ago.  So we are moving to exclude

5    evidence because we have been denied the opportunity to test

6    Mr. McAlexander's equipment and verify if it works, and

7    otherwise obtain information that would allow us to

8    cross-examine him.

9           And our own expert, Mr. Stubben, has taken a look at

10   the video they produced in January, all of the tests that Mr.

11   McAlexander ran.  And he sees a lot of anomalies and questions

12   in that video that indicate that those tests are unreliable.

13   But to be fully prepared at trial, we really should have been

14   allowed to go and inspect and test the equipment.  Since we

15   have not been allowed to do that --

16          THE COURT:  Did you file a motion?

17          MS. DEGNAN:  We did with this.  This is the process.

18   We filed a combined motion to exclude.  If Your Honor doesn't

19   want to exclude it, then we want an immediate order to allow

20   us to go test this equipment.  But given the late date --

21          THE COURT:  I understood that you were willing to

22   allow them to test the equipment?

23          MR. GOVETT:  Yes.  We have always said you can

24   test -- you can inspect the equipment.  With respect to

25   tests, we said, look, you are getting -- you are wanting free

1    rein in his lab.  No, we are not giving you free rein in his

2    lab.  Tell us what you want to do.  It took the longest time

3    to get the answer about tell us what you want to do because we

4    don't just want open parameters.  Then when we had this

5    meet-and-confer which she is referring to, it was we want him,

6    Mr. McAlexander, to do the test; and we want to be there to

7    observe it.  We said, no --

8         MS. DEGNAN:  Your Honor, that is not what we asked

9    for.  They said we don't want you alone in our lab.  We said,

10   you know what, we are willing to work with you.  If you feel

11   that you need to have Mr. McAlexander touch his own equipment

12   because you are afraid we are going to break it, fine.  We

13   were trying to accommodate their request.  So it is not like

14   we have asked Mr. McAlexander to come and redo his test in

15   front of us.  They don't want us in his lab for some reason --

16        THE COURT:  Okay.  I am not going deny it, I'm not

17   going to exclude the evidence; but I will allow you to inspect

18   his equipment if you wish to prior to trial.

19        MS. DEGNAN:  And test it, Your Honor?

20        THE COURT:  Test it with him present.

21        MS. DEGNAN:  And they have recently decided now we

22   are supposed to pay them in order for them to be able to use

23   this evidence in trial.  They want us to pay Mr. McAlexander

24   for letting us into his lab.  We think that is absurd.  I want

25   to make sure there is no suggestion that we are supposed --

1          THE COURT:  How long is this going to take?

2          MS. DEGNAN:  We think we can do it in less than a

3   day.

4          MR. GOVETT:  Yeah, what -- we asked Mr. McAlexander

5   about what they wanted to do.  So, as I understand the Court's

6   ruling, just make it available to them.  What they wanted us

7   to do is set it up exactly as he set it up in his test and so

8   forth and then run it.  That is what we understood.  If there

9   is a dispute, there is a dispute; but that is what we

10  understood.  He said, look, it is going to take a day for me

11  to set it up exactly as they want it and then another day to

12  run it.  All we are saying is that is not what we are

13  agreeable to.  If you want to come in the lab and we will make

14  the stuff available to you for your inspection, if you want to

15  run whatever you want to run with it right there, go ahead and

16  do it.  That is fine with us.  We are not asking to be paid

17  for that.  But if the Court goes this extra step, which is

18  pretty onerous --

19         THE COURT:  I'm not going that extra step.  You can

20  go in and inspect his equipment.  You don't have to pay for

21  it.

22         MS. DEGNAN:  And run tests?

23         THE COURT:  All right.  But he is not required to

24  set it up or do any of that or rerun the test or anything.

25         MR. GOVETT:  Okay.  Your Honor, understood.

1          MS. DEGNAN:  Okay.  No. 2 has to do with what we

2     call boot-strapping or piggy-backing expert reports.  Mr.

3     Bratic, the damages expert, in his report includes numerous

4     statements of technical expertise that he attributes to Mr.

5     McAlexander that never appeared in Mr. McAlexander's expert

6     report, so we did not have an opportunity to do a rebuttal

7     expert report on them.  They never appeared.

8          Tellingly, yesterday, yesterday, Your Honor, they

9     supplemented Mr. McAlexander's technical expert reports to

10    incorporate by reference all of the hearsay statements in Mr.

11    Bratic's expert report, so we think that this is untimely, we

12    think it is unfair, and we want to exclude the long list that

13    we put in our motion of the technical statements that Mr.

14    McAlexander told Mr. Bratic, did not put in an expert report

15    for us, and give us a chance to respond in a responsive expert

16    report.

17         MR. GOVETT:  Your Honor, I am going to hand up to

18    you what it is that she is saying he supplemented yesterday.

19    Mr. McAlexander served his expert report in early September.

20    Because of that hurricane that knocked out downtown Houston --

21    I can't remember, sometime in the summer, you recall the Chase

22    tower was blown out and so forth -- mr. Bratic served his a

23    week or so later on September 26th.  All this stuff that they

24    said we didn't have the opportunity to ask you about, it has

25    been in Mr. Bratic's report since September 26th, 2008.

1          I handed you up the declaration of Mr. McAlexander

2    when we saw this.  This is a classic "gotcha."  It has been

3    out on the table way before Mr. McAlexander's deposition.  By

4    the way, he was deposed three times; on October 17th, November

5    4th, and November 14th.  They had an opportunity to ask him

6    about those things.  He was prepared to testify about those

7    things.  They never did.  Mr. Bratic was deposed on November

8    25th.  I have flagged the yellow pages up there for you.  They

9    asked him extensively about Mr. Alexander.

10         It is a total "gotcha" saying, well, even though he

11   told Mr. Bratic about this stuff and they talked a bunch of

12   times, it is off the table, they are trying to exclude it.  It

13   is very unfair.  If they wanted to ask Mr. McAlexander about

14   it, they should have.  Microsoft is the only one that has

15   filed this motion in limine.  They didn't even show up to Mr.

16   Bratic's deposition.

17         MS. DEGNAN:  Your Honor, if I may respond.  The

18   Federal Rules require an expert to put their opinions and the

19   basis thereon in an expert report so as to reduce the cost of

20   depositions.  We don't have to take a deposition at all of the

21   expert.  His opinions have to be in his report.  And, indeed,

22   it is particularly interesting in this case because they

23   required us to pay Mr. McAlexander for his deposition prep

24   time and the time in which he was sitting in deposition for

25   us.  We did not depose Bratic at all, and we did not attend

1    the other depositions by Nintendo, nor did we pay for them.

2           And we should not have to pay for the privilege of

3    understanding Mr. McAlexander's opinions.  They are supposed

4    to be in his expert report; and if we don't depose him, he is

5    limited to what is in his expert report.  At this late date

6    after we have not had a chance to respond to those opinions

7    and after we chose not to pay him to tell us his opinions at

8    his deposition, we should not have to be forced to respond to

9    this information at this late date.

10          THE COURT:  Motion is denied.  I'm sorry -- yes,

11   motion is denied.

12          What is next?

13          MR. GOVETT:  No. 3

14          MS. DEGNAN:  No. 3 -- the next one is I think

15   No. 5 I thought you had -- I'm sorry.  No. 3 is our entire

16   market value rule motion, Your Honor.  So in this case Mr.

17   Bratic has opined that the entire revenue associated with the

18   sales of consoles and controllers of the Xbox and Xbox 360

19   should be the base of his reasonable royalty calculation.  So

20   he takes all of the revenue associated with the Xbox and Xbox

21   360 controllers and consoles and he times it by three to five

22   percent.

23          Now, the law is very clear that in order to use this

24   revenue in this way, there needs to be a threshold showing in

25   order to avoid the prejudice that is associated with such an

1    inflated number being given to the jury.  The threshold that

2    has to be made is that the plaintiff has a burden to show that

3    the patented invention, the patented feature is the basis for

4    customer demand.  As we set forth in our brief, Mr. Bratic

5    made no effort whatsoever to do that.  His expert report is

6    devoid of any showing on that point.

7         Furthermore, Mr. Fenner himself admitted that the

8    invention, which is a specific way to connect the analog

9    joystick to a low voltage processor using a low voltage

10   interface circuit, this very specific narrow invention, is not

11   something that consumers care about.  We have cited that

12   information in the brief.  Because there has not been a

13   threshold showing, it would be unduly prejudicial to allow any

14   evidence of Microsoft's revenue and the revenue associated

15   with the Xbox and Xbox 360 controllers to go to the jury at

16   all.

17        THE COURT:  Response?

18        MR. GOVETT:  Yes.  The claim, Your Honor, is

19   directed -- it is Claim 9.  I guarantee you that one is going

20   to be in the case.  But it is a processor-based system which

21   comprises a processor and joystick and the interface between

22   the two, as you saw up on the board a little bit earlier.  It

23   is the whole thing.  Xbox, you buy an Xbox to use the

24   joysticks to play games on.  If it didn't have a joystick, if

25   it didn't connect, you couldn't play the games.  It is pretty

1    self-evident there.  Mr. Bratic takes all that into

2    consideration, takes all that into account when he comes up

3    with this rate.

4              THE COURT:  No. 3 is denied.

5              What is next?

6              MS. DEGNAN:  Your Honor, the next one for us has to

7    do with restricting the claim constructions that Your Honor

8    has given for buffer circuit and pulse generator.  There

9    are -- I will admit there are certain overlaps here with the

10   summary judgment motions, in particularly the All Elements

11   Rule as it applies to the pulse generator limitation.  We

12   think it is clear -- let me explain -- the doctrine of

13   equivalents is very confusing to the jury.  As a result, the

14   Federal Circuit has placed certain legal restrictions on when

15   it can be applied.  One is the All Elements Rule.

16             Two is you have to have a particularized showing of

17   element by element and identify the element that is missing

18   and explain what the differences are and why they are

19   insubstantial.  Here expert reports do not contain any kind of

20   particularized showing of what the differences are and why

21   they are insufficient.  They just say literal infringement is

22   there.  If it is not literal infringement, then the

23   differences are insubstantial.  So we have two bases for

24   asking for an instruction to prevent the doctrine of

25   equivalents from being presented to the jury on the --

1         THE COURT:  Which one are you on?  Are you on No. 5?

2         MS. DEGNAN:  That's right.

3         THE COURT:  The evidence that contradicts the

4    Markman order?

5         MS. DEGNAN:  I'm sorry, Your Honor, I jumped to 9.

6         THE COURT:  All right.  You are on 9.  I'm trying to

7    figure what your argument had to do with.

8         MS. DEGNAN:  I'm sorry, Your Honor.

9         THE COURT:  Okay.  What about No. 5; is that agreed

10   to?

11        MS. DEGNAN:  No. 5 -- let me back up.  No. 5 is not

12   agreed to.  I think it really overlaps the summary judgment

13   motions.  As Mr. Cordell explained to you with respect to

14   buffer circuit, Fenner is really trying to resurrect a claim

15   construction they lost --

16        THE COURT:  I'm going to deny No. 5.  I just don't

17   think that is a proper subject for a motion in limine.  I

18   think both sides know they should not deviate from the Court's

19   Markman order.

20        MR. GOVETT:  Yes.

21        THE COURT:  And if any side does, they are likely to

22   get an instruction that will embarrass them in front of the

23   jury, so be forewarned.

24        All right.  What is next?

25        MS. DEGNAN:  Now, we are on to No. 9, which is

1    really our last undisputed one -- this has to do with the

2    doctrine of equivalents.  Getting back to the doctrine of

3    equivalents.  It is very confusing to the jury, as the Federal

4    Circuit has recognized by setting forth some very specific

5    rules under which you can have the doctrine of equivalents,

6    the first thing that reigns in the doctrine of equivalents is

7    the All Elements Rule.

8            As is explained in our briefing in the summary

9    judgment context, here Fenner's theory of infringement under

10   the doctrine of equivalents is essentially to say we don't

11   need to have the width of a pulse represent the coordinate

12   position of a joystick.  It can be multiple pulses.  Yes, we

13   know they all have widths.  And those multiple pulses go ahead

14   and provide information about joystick position.  So they can

15   say the word pulse, multiple, and width and position all in

16   the same sentence --

17           THE COURT:  Okay.  I think that is a matter that is

18   in controversy.  I think it is going to be argued in front of

19   the jury.  I don't think it is a proper matter for any motion

20   in limine, so I am going to deny it.

21           MS. DEGNAN:  Thank you, Your Honor.

22           THE COURT:  No. 13.

23           MS. DEGNAN:  13 was already ruled upon.

24           THE COURT:  All right.  Nintendo's?

25           MR. RIEDINGER:  Your Honor, on the remaining

1   motions I think you have given us some guidance on each, but

2   there are some open areas on them.

3           THE COURT:  Okay.

4           MR. RIEDINGER:  So I think we would just like to go

5   through them.

6           THE COURT:  All right.

7           MR. RIEDINGER:  We have what we call our omnibus

8   motion.  And I think the only one that still has some open

9   area is No. 4, discovery disputes.  We believe that discovery

10  disputes should not be discussed in front of the jury.  That

11  is something that Your Honor has resolved.  That should be out

12  of the presence of the jury.

13          MR. GOVETT:  The only issue remaining on that --

14  agreed.  The only issue remaining on that --

15          THE COURT:  Whether I give an instruction?

16          MR. GOVETT:  Yes.

17          THE COURT:  That is granted unless the Court gives

18  an instruction.

19          MR. RIEDINGER:  And then we had two separate

20  motions, one is on the doctrine of equivalents.  We have a

21  different motion on the doctrine of equivalents than

22  Microsoft.  Ours is on prosecution history estoppel.  We

23  believe that they are precluded from arguing the doctrine of

24  equivalents, and the Federal Circuit is fairly adamant that

25  the doctrine of equivalents should not be presented to the

1    jury and it is inappropriate when, for example, it is

2    prohibited by prosecution history estoppel.

3         So we have explained that there have been amendments

4    that narrowed the claims.  This is all in the pulse width.  So

5    there is prosecution history estoppel because of the amendment

6    to add the pulse width language, plus there was prosecution

7    history estoppel because of the argument --

8         THE COURT:  Shouldn't that be more a matter for a

9    motion for partial summary judgment on doctrine of

10   equivalents?

11        MR. RIEDINGER:  Actually I thought it was the

12   opposite, Your Honor, but we could make it as a summary

13   judgment motion in the alternative.  I do think it is a

14   question of what evidence they are allowed to present because

15   they want to present evidence on the equivalents.  There is a

16   threshold question whether they can present that evidence at

17   all, which is why I believe that it is really a motion in

18   limine rather than a motion for summary judgment.

19        THE COURT:  Are you through?

20        MR. RIEDINGER:  Yes, Your Honor.

21        THE COURT:  Okay.  Response?

22        MR. GOVETT:  Yes, Your Honor.  I think that you hit

23   the nail on the head with respect to summary judgment.  The

24   prosecution history estoppel was briefed as part of the

25   summary judgment issues.  So as I understand the Court's

1   ruling, it is being carried through trial.  And then the Court

2   will decide at the time the jury is charged what goes in and

3   what doesn't.

4          THE COURT:  Response?

5          MR. RIEDINGER:  Well, of course, that is contrary to

6   the procedure that is recommended by the Federal Circuit.  I

7   will agree, however, that Your Honor has the discretion to

8   choose that approach.  We think we can simplify the trial by

9   eliminating something that as a matter of law should be

10  precluded from even being presented at the trial.  So we would

11  have a shorter trial if we didn't have to have the excursion

12  into the doctrine of equivalents.

13         THE COURT:  I will deny that at this time, but

14  reraise it with me later and I will take a closer look at it.

15         MR. RIEDINGER:  Thank you, Your Honor.

16         Then I believe our final motion is on claim

17  construction, and perhaps you have given us guidance in your

18  discussion of Microsoft's motion.  But we really had two areas

19  that we identified where we believe that Fenner's approach is

20  directly contrary to the Court's claim construction; the

21  buffer circuit not being a separator of voltage and the

22  ability to use multiple pulses.  Again, this is a question of

23  simplifying things for the jury so we don't have to present in

24  front of the jury the position explaining why multiple pulses

25  can't be a pulse with a width representing joystick position

1   and explaining why a buffer circuit that has the same voltage

2   input, output, and inside can't be a voltage separator.  We

3   think the Court should just eliminate that whole presentation.

4           THE COURT:  Response?

5           MR. GOVETT:  Yes, Your Honor.  The response, Your

6   Honor -- we covered this.  These are the same arguments that

7   were made in the summary judgment motion.  We went through all

8   that.  We are in line with the Court's claim construction, and

9   that is going to be a fact issue, as Ms. Quinn put up on the

10  board there, fact issues for the jury to decide.

11          THE COURT:  I'm going to deny that.  What else do we

12  have?

13          MR. RIEDINGER:  Actually, Your Honor, there are only

14  two things that we should bring up.  They are not motions in

15  limine.  But, first of all, I would like some, perhaps,

16  additional guidance on Mr. McAlexander's supplement that was

17  served yesterday afternoon about 2:55 p.m., the supplement

18  that added additional statements and opinions to Mr.

19  McAlexander's expert report.  That is, what, five months after

20  his last expert report?  Independent of the question of Mr.

21  Bratic being able to rely on that, we think it is just an

22  untimely --

23          THE COURT:  Is this something that has never been

24  added or gone into before?

25          MR. RIEDINGER:  Never, Your Honor.

1           THE COURT:  What are the areas you are referring to?

2           MR. RIEDINGER:  So, I believe --

3           THE COURT:  Or the statements.

4           MR. RIEDINGER:  You were given a copy of Mr.

5    McAlexander's supplement.  He refers to six or seven

6    paragraphs of Mr. Bratic and said I adopt those statements as

7    part of my report.  So it is something that is new in Mr.

8    Bratic's report.  We took the deposition of Mr. Bratic both on

9    the subject of infringement and on the subject of validity,

10   and none of that was in any of his expert reports when we took

11   the deposition.  So now we are about a month from trial and he

12   supplements his report with additional statements that we have

13   not had an opportunity to deal with.

14           So what we would like is for Your Honor to just say

15   that is not part of Mr. McAlexander's report.

16           MR. GOVETT:  I believe you have already ruled on

17   that, Your Honor, but let me address it.  This has been out

18   there, as I said, since September 26th, 2008.  It is part of

19   the expert reports in this case.  Mr. Bratic, in fact -- it is

20   not like Mr. Bratic does not disclose where he got this from.

21   He has got footnotes throughout his report, interview with Joe

22   McAlexander, interview with Joe McAlexander, interview with

23   Joe McAlexander, interview with Joe McAlexander.  That is the

24   source of it.  All Mr. McAlexander is saying is, yep, I spoke

25   with Bratic and we had a discussion about it; and that is what

1    I told him, and those

2    are my opinions, exactly as he has got them there.  That is

3    it.  It is not like some big --

4            THE COURT:  He is just confirming --

5            MR. GOVETT:  Yes.

6            THE COURT:  -- what is already in Bratic's report?

7            MR. GOVETT:  That's exactly what he said.

8            MR. RIEDINGER:  That's what he said.

9            MR. GOVETT:  I affirm those discussions --

10           THE COURT:  He is confirming that is what was said

11   between the two of them?

12           MR. RIEDINGER:  He is confirming those statements as

13   his opinions, which were never before part of his expert

14   report until yesterday afternoon --

15           THE COURT:  But it was part of Bratic's report?

16           MR. RIEDINGER:  It was part of Bratic's report but

17   not part of Mr. McAlexander's report.

18           THE COURT:  So you have known about it from Bratic's

19   report since September, right?

20           MR. RIEDINGER:  We have known what Mr. Bratic had to

21   say, but we have had no indication that McAlexander was

22   actually going to say those were his opinions, as opposed to

23   how Mr. Bratic characterized it.  One way to solve this, Your

24   Honor, would be to allow us to depose Mr. McAlexander again on

25   those subjects because we have never had the opportunity.

1    They weren't in Mr. McAlexander's report, certainly not as his

2    opinions.

3            MR. GOVETT:  If they want to do it, that's fine.

4            THE COURT:  All right.  I will allow you to take a

5    short deposition no longer than how long?  Two hours?

6            MR. RIEDINGER:  Two hours should be more than fine.

7    Thank you, Your Honor.

8            THE COURT:  All right.  What else?

9            MR. RIEDINGER:  Well, we have the exhibits, Your

10   Honor, and I know your time is limited.

11           MR. GOVETT:  We are in overtime.

12           THE COURT:  I love to go through exhibits.  They are

13   as much fun as motions in limine.

14           MR. RIEDINGER:  Your Honor, we have 280 exhibits.

15   They have objected to 200 of them on an enormous number of

16   different reasons.  We are ready to talk about that right now

17   and try to resolve them.  We suggested to the opposing side

18   that we try to resolve that in our conferences yesterday.

19   They were unavailable to do that.  We need to resolve a large

20   number of issues on the exhibits.  If we don't, we are going

21   to have a very long trial.

22           THE COURT:  I am going to instruct both sides to

23   meet and confer on the exhibits.  I normally do not spend an

24   inordinate amount of time delving through objections to

25   exhibits.  You have good lawyers on both sides.  I expect

1    y'all to get that worked out.  What you don't have worked out

2    after jury selection, I will take up with you.

3              MR. GOVETT:  Yes, sir.

4              MR. RIEDINGER:  Thank you, Your Honor.

5              THE COURT:  What else?  All right.  With regard to

6    your time limits, each side will have 45 minutes for voir dire

7    and 45 minutes for opening statement, 12 hours for direct and

8    cross-examination, and 60 minutes for closing arguments.

9              MR. CARROLL:  Your Honor?

10             THE COURT:  Yes.

11             MR. CARROLL:  For voir dire will you show the film

12   to the whole panel before we voir dire them.  That would sure

13   help us --

14             THE COURT:  Yes, that is the way we did it last

15   time, and we will do that -- I think that worked well.

16             MR. CARROLL:  Thank you.

17             MR. CORDELL:  Your Honor, is it my understanding it

18   is 45 per side or do we get some allocation --

19             THE COURT:  To be split between the two of you.

20             MR. RIEDINGER:  So, Your Honor, you are giving us

21   six hours to defend ourselves in four different products and

22   14 different claims?  And, Your Honor, it is just impossible

23   for us to present a fair defense on all of that --

24             THE COURT:  Don't y'all have pretty similar

25   defenses?

 1         MR. RIEDINGER:  No, Your Honor, we don't.  Our

 2    products are different.  As I emphasized, the GameCube is

 3    radically different from the other two, so we can't simply

 4    piggy-back onto arguments made by Microsoft.  And the same

 5    thing is true of Microsoft arguments because our products are

 6    so different.  They function in radically different ways.

 7    Part of -- one of the major differences between the Wii and

 8    the Microsoft products is the use of the accelerometer to

 9    determine the position of the cursor on the screen and the

10    position of the characters.  That is not something that is

11    present in the Microsoft products.  The GameCube has just a

12    totally different set of signals that come out of it, so

13    limiting us to six hours is --

14         THE COURT:  Would y'all plan to divide your time

15    equally; is that what you have discussed?

16         MR. CORDELL:  That is what we had discussed, Your

17    Honor.  I have shared Mr. Riedinger's concern, that is a

18    pretty brisk presentation, just given the -- while this isn't

19    the most complex case --

20         THE COURT:  I would think 80 percent of your

21    defenses would be the same.

22         MR. CORDELL:  There certainly -- you heard the

23    commonality today.  We talked about the summary judgment

24    issues, and those certainly will figure very promptly in the

25    trial; but there are other issues we would like to go into, if

1  we could, that were not appropriate for summary judgment that

2  we think are compelling for the jury.  That makes it

3  difficult.  We do have different experts, for example, on

4  infringement.  Each will have to testify -- we have damages

5  experts.

6           MR. RIEDINGER:  Your Honor, we have

7  Japanese-speaking witnesses.  The people who designed the

8  products that are accused of infringement are Japanese.  None

9  of them speak English.  So they have to be translated.  So,

10  again, the six hours is very, very short.

11           THE COURT:  All right.  What would be the minimum

12  amount of time you think you could get by with?

13           MR. RIEDINGER:  Your Honor, I don't believe that we

14  could get by with anything less than double that; 12 hours to

15  present our case including --

16           THE COURT:  You only put 22-and-a-half hours in your

17  request, so now you are asking for 24?

18           MR. RIEDINGER:  Well, Your Honor, we have thought --

19  we, this is Nintendo, thought because we have the translator

20  issue, because our witnesses are going to be testifying in

21  Japanese, that it is going to take us longer than it is going

22  to take Microsoft, plus we have the entirely separate product,

23  the GameCube, which is totally different from the other kinds

24  of products that are present in the case.

25           MR. CORDELL:  Certainly ten hours would be

1    sufficient for Microsoft, Your Honor.

2         THE COURT:  Does Plaintiff wish to weigh in on this?

3         MR. GOVETT:  That's a lot of time for trying cases

4    out here.  I mean, you know, we get it done.  I think the

5    Court has given more than adequate time on this.  If during

6    the course of the trial the Court feels the need to assess the

7    issue, we can.  But my experience has been when we are on the

8    clock we normally give time back.

9         THE COURT:  I want to give you adequate time to

10   present your case, but I just don't want to totally wear the

11   jury out.

12        MR. GOVETT:  One thing I might add, Your Honor, is

13   really -- obviously we have the one patent.  And the

14   independent claims are very, very similar.  We probably won't

15   even assert Claim 1, I will just tell you that right now.  So

16   we are looking at 9 and 14.  There are very similar claim

17   limitations as you have seen.  So really, in essence, we are

18   talking about one claim.

19        MR. RIEDINGER:  Well, but, Your Honor, we have

20   invalidity arguments, and every dependent claim we have to

21   show as invalid, as well.  We can't just show the invalidity

22   of the independent claims.  But the biggest problem, Your

23   Honor, has to do with the difference in the products.  There

24   are not sufficient commonalities to simply say we can present

25   one product and say that is representative of everything else.

1   Every product is unique.

2           THE COURT:  Let me ask you this:  Do Microsoft and

3   Nintendo want to combine your time for -- however much time I

4   give you, combine it for my time-keeping purposes and then

5   y'all split it up however you want to; or do each of you want

6   to have your time assigned and me keep track of that

7   separately?

8           MR. RIEDINGER:  I'm sure we could work it out with

9   Microsoft.

10          MR. CORDELL:  That would be appropriate, Your Honor,

11  because, for example, some of the issues are completely

12  common, the validity issues.

13          THE COURT:  That is what I was thinking.

14          MR. GOVETT:  Which the validity issue -- may I ask

15  one question, Your Honor?

16          THE COURT:  Uh-huh.

17          MR. GOVETT:  Which does raise the question, we have

18  been told their validity experts are essentially identical,

19  we have been told.  We are going to put one of them on.  On

20  the same timing as we are going to put -- we are going to tell

21  them which claims are no longer in the case, the Friday before

22  voir dire, can they tell us which expert are you going to

23  call?

24          THE COURT:  Any problem with that?

25          MR. RIEDINGER:  No, Your Honor, although there is

1  that one little caveat.  Your Honor has encouraged us to

2  settle; and if one party settles, then obviously that might

3  cause a change in the validity expert.

4          THE COURT:  Right.  Very well.  Notify them by

5  the -- what date did I give you?

6          MR. GOVETT:  It is the Friday before March 2nd,

7  whatever --

8          THE COURT:  Friday before identifying with that.

9          All right.  I will tell you I will up it to 15

10  hours per side against my better judgment for direct and

11  cross-examination, and y'all can split that up as you choose.

12          MR. RIEDINGER:  We will do our best, Your Honor.

13          THE COURT:  I bet you will give me time back.  I

14  have only had one case where they used it all, and they had

15  enough time.

16          All right.  What else can the Court help you with

17  today?

18          MR. CORDELL:  Nothing further from Microsoft.

19          THE COURT:  I see Mr. Knowles' shining face in the

20  back of the courtroom, your able mediator, so I would

21  encourage y'all to have a visit with him and see if there is

22  not some time between now and voir dire, certainly before

23  trial, that y'all can get together and make another run at

24  trying to get this case settled.  I think both sides have

25  significant risks in the case, and hopefully you can find a

135

1    middle ground that you can both live with; maybe not be happy

2    with, but live with.

3              All right.  Have a good day.

4        (Recess was taken.)

5

6                    C E R T I F I C A T I O N

7

8    I certify that the foregoing is a correct transcript from the

9    record of proceedings in the above-entitled matter.

10

11

12   /s/ Shea Sloan

13   SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
14   STATE OF TEXAS NO. 3081

15

16

17

18

19

20

21

22

23

24

25